IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____ :
ROY HOROWITZ                                                :
   Hillsborough, NJ  08844,                                 :
LINDA LARSON                                                :
   Lake Havasu City, AZ  86406,                             :
KEMPTEN POLLARD                                             :
   Bradenton, FL  34209,                                    :
KATHERINE SEAMAN                                            :
   Bernardsville, NJ  07924,                                :
                    and                                     :
KATHLEEN SWEENEY                                            :
   Blackwood, NJ,                                           :
   *on behalf of themselves individually* :
   *and on behalf of those similarly*                       :
   *situated,*                                              :
                                                            :
                    Plaintiffs,                             :    CIVIL ACTION NO. __
                                                            :
                                                            :    ADEA COLLECTIVE ACTION
          v.                                                :
                                                            :    JURY TRIAL DEMANDED
AT&T, INC.                                                  :
   208 S. Akard St.                                         :
   Dallas, TX  75202,                                       :
AT&T CORP.                                                  :
   One AT&T Way                                             :
   Bedminster, NJ  07921,                                   :
AT&T SERVICES, INC.                                         :
   208 S. Akard St.                                         :
   Dallas, TX  75202,                                       :
                    and                                     :
AT&T MOBILITY SERVICES, LLC                                 :
   1025 Lenox Park Blvd NE                                  :
   Atlanta, GA  30319,                                      :
                                                            :
                    Defendants. :
_____ :

## COMPLAINT

## I.   PRELIMINARY STATEMENT

Defendant AT&T, Inc., by and through its owned and controlled subsidiaries

through which it operates and does business including defendants AT&T Corp., AT&T Services, Inc., and AT&T Mobility Services, LLC (collectively referred to hereinafter as "AT&T"), has conducted a massive and centrally planned workforce reduction with the intent and effect of discriminatorily removing older employees from its workforce, replacing them with younger workers, and fraudulently and falsely telling the older workers that, if they sign an agreement to receive a severance payment, they cannot bring an action for age discrimination under the federal law protecting them.

AT&T at the <u>very highest level has publicly expressed its displeasure in having an aging workforce</u> and its desire to reinvent the company.  As part of this reinvention, AT&T came up with a company-wide plan to replace its aging workforce with a younger one by the year 2020.  **AT&T has implemented its age discriminatory "2020" plan by a three-step "surplus," then termination and fraudulent release scheme, infected with age bias and executed in waves to keep its workers in the dark.**  For several years now and continuing until the present, AT&T has per its 2020 plan intentionally targeted older workers for termination but has broken up the termination process in a purposeful attempt to: a) conceal its discrimination; and b) perpetrate a massive fraud against older workers.

The first step in AT&T's scheme to rid itself of older workers is an age-biased selection process in which certain employees are placed on "surplus" status.  It is followed by a second step in which employees who have been notified of "surplus" status may land an alternative position through an age-biased application process; if unable, then they are terminated.  <u>Not all employees who are notified of "surplus" status terminate employment</u>.  In the third step, older workers who have been terminated are

promised a severance payment if they sign a "General Release and Waiver" applicable *up to and including termination*, but which is accompanied by <u>unintelligible and false disclosures that contain no demographic data on actual terminations</u>.

Although AT&T tells the terminated older workers that the "General Release and Waiver" releases all claims and rights to bring a class, collective or representative action, including under the Age Discrimination in Employment Act ("ADEA"), AT&T <u>knows that its representation is false</u> because the General Release and Waiver is plainly invalid and unenforceable under the amendment to the ADEA specifically aimed at protecting older workers by imposing strict and unqualified statutory strictures on waivers (the Older Workers Benefit Protection Act, "OWBPA"). **Unless AT&T's fraudulent deception is rectified by this Court, a great and untold number of employees who were unlawfully terminated because of their age will never know that they can in fact vindicate their rights by bringing an action against AT&T for age discrimination, and, further, AT&T will continue its unlawful practices.**

Roy Horowitz, Linda Larson, Kempten Pollard, Katherine Seaman, and Kathleen Sweeney (the "Named Plaintiffs"), are long-serving and well qualified former employees terminated by AT&T pursuant to AT&T's discriminatory 2020 plan to replace its older worker force with a younger one via its three-step "surplus," then termination and fraudulent release scheme.  Named Plaintiffs now bring this action against AT&T for violation of the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 621, *et seq.*  Named Plaintiffs bring this action pursuant to the ADEA, 29 U.S.C. § 626(b), incorporating section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), on behalf of

themselves individually and on behalf of similarly situated individuals ("Older Workers"), defined as all former non-bargained employees of AT&T who since May 20, 2015, and when age 40 or older, received from AT&T a "Surplus Notification Letter," were terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG  - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing."

The Named Plaintiffs seek an Order providing that notice of this lawsuit be given to each Older Worker as defined above.   This notice should advise the Older Workers that: (1) the General Release and Waiver that they may have signed did not, in fact, release or waive their claims or rights under the ADEA, including their right to participate in this collective action; (2) this action is alleging that AT&T's massive workforce reduction pursuant to its 2020 plan and three-step "surplus," then termination and fraudulent release scheme was and is age discriminatory; (3) each Older Worker has the right to opt-in to this lawsuit as a plaintiff; and (4) the Older Workers do not repay any consideration that they might have received in exchange for signing the General Release and Waiver in order to opt-in to this lawsuit.

In addition, the Named Plaintiffs seek injunctive and declarative relief, damages, including compensatory and liquidated damages, and all other relief under the ADEA and any other relief that this Court deems appropriate.

## II.    PARTIES

1.      Plaintiff Roy Horowitz is an individual and citizen of the state of New Jersey, residing therein in Hillsborough, NJ  08844.

2.      Plaintiff Horowitz was born in August, 1959 and is currently fifty-seven (57) years of age.

3.      Plaintiff Linda Larson is an individual and citizen of the state of Arizona, residing therein in Lake Havasu City, AZ  86406.

4.      Plaintiff Larson was born in February, 1955 and is currently sixty-two (62) years of age.

5.      Plaintiff Kempten Pollard is an individual and citizen of the state of Florida, residing therein in Bradenton, FL  34209.

6.      Plaintiff Pollard was born in February, 1947 and is currently seventy (70) years of age.

7.      Plaintiff Katherine Seaman is an individual and citizen of the state of New Jersey, residing therein in Bernardsville, NJ  07924.

8.      Plaintiff Seaman was born in December, 1967 and is currently forty-nine (49) years of age.

9.      Plaintiff Kathleen Sweeney is an individual and citizen of the state of New Jersey, residing therein in Blackwood, NJ  08012.

10.     Plaintiff Sweeney was born in August, 1964, and is currently fifty-two (52) years of age.

11.     Defendant AT&T, Inc. is a Delaware corporation that is the parent company of several wholly-owned and controlled subsidiary corporations, including

defendants AT&T Services, Inc., AT&T Mobility Services LLC, and AT&T Corp., by and through which it operates and does business.

12.    Defendant AT&T, Inc. is the "alter ego" of its various subsidiary controlled companies, including defendants AT&T Services, Inc., AT&T Mobility Services LLC, and AT&T Corp.

13.    Defendant AT&T, Inc., by and through its wholly-owned and controlled subsidiary corporations through which it operates and does business, maintains multiple places of business in New Jersey, including principal places of business; conducts business through its subsidiary companies duly registered to transact business in the state of New Jersey and with registered agents located in New Jersey for service of legal process; maintains systematic and continuous activity such that it is at home in New Jersey; and employs thousands of people in the state of New Jersey, including employees subject to and impacted by the discriminatory practices and acts alleged herein and giving rise to this action.

14.    Defendant AT&T Corp. is a New York corporation duly registered to transact business in the state of New Jersey, with a registered agent located in New Jersey for service of legal process.  It is has a principal place of business located in Bedminster, New Jersey, maintains systematic and continuous activity such that it is at home in New Jersey, and employs many people in the state of New Jersey, including employees subject to and impacted by the discriminatory practices and acts alleged herein and giving rise to this action.

15.    Defendant AT&T Services, Inc. is a Delaware corporation duly registered to transact business in the state of New Jersey, with a registered agent located in New

Jersey for service of legal process.  It maintains several places of business located throughout the state of New Jersey, maintains systematic and continuous activity such that it is at home in New Jersey, and employs many people in the state of New Jersey, including employees subject to and impacted by the discriminatory practices and acts alleged herein and giving rise to this action.

16.     Defendant AT&T Mobility Services, LLC is a Delaware limited liability corporation duly registered to transact business in the state of New Jersey, with a registered agent in New Jersey for service of legal process.  It maintains several places of business located throughout the state of New Jersey, maintains systematic and continuous activity such that it is at home in New Jersey, and employs many people in the state of New Jersey, including employees subject to and impacted by the discriminatory practices and acts alleged herein giving rise to this action.

17.     Defendant AT&T, Inc., shares with its controlled subsidiary companies, including defendants AT&T Services, Inc., AT&T Mobility Services LLC, and AT&T Corp., *inter alia*, common ownership, management, administrative services, personnel, policies and employment practices.

18.     Defendant AT&T, Inc., and its subsidiary companies, including defendants AT&T Services, Inc., AT&T Mobility Services LLC, and AT&T Corp., hold themselves out to the public and their employees as an AT&T "family of companies" known as "AT&T" which, together and as one entity, employ over 270,000 people.

19.     Defendant AT&T, Inc., and its subsidiary companies, including defendants AT&T Services, Inc., AT&T Mobility Services, LLC, and AT&T Corp., are interconnected such that they are considered a "single" and/or "integrated" employer and/or enterprise.

20.     The massive and centrally planned discriminatory "2020" workforce reduction plan was, at the direction and under the control of AT&T, Inc., applied to and implemented throughout the AT&T "family of companies" without regard to corporate formalities or distinctions.  For example, while Named Plaintiff Horowitz was issued his W-2 by AT&T Corp. and Named Plaintiff Pollard was issued his W-2 by AT&T Services, Inc., they were both terminated from employment on June 21, 2016; pursuant to the same Surplus Notification Letter, signed by the same individual (with no indication as to particular AT&T subsidiary/operating company status), presented with the same General Release and Waiver (identical in all respects, including scope of releasees, except for reference to company issuing the W-2) and provided an "ADEA Listing" pertaining to the same  "Business Case ID," "Organization," and "Decisional Unit."

21.     At all times material hereto, AT&T has been engaged in an industry affecting interstate commerce and has acted as an "employer" within the meaning of the ADEA.

22.     At all times material hereto, AT&T employed more than twenty (20) people.

23.     At all times material hereto, AT&T acted by and through its authorized agents, servants, workmen and/or employees within the course and scope of their employment with AT&T and in furtherance of AT&T business.

24.     At all times material hereto, Named Plaintiffs were employees of AT&T within the meaning of the ADEA.

## III.     JURISDICTION AND VENUE

25.     The causes of action set forth in this Complaint arise under the ADEA, as

amended by the OWBPA, 29 U.S.C. § 621, *et seq*.

`        26.      The District Court has subject matter jurisdiction over the claims pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.

27.      Venue is proper under 28 U.S.C. § 1391(b).

28.      On or about March 15, 2016, Plaintiff Larson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Attached hereto, incorporated herein and marked as Exhibit "A" is a true and correct copy of Plaintiff Larson's Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

29.      More than sixty (60) days have passed since Plaintiff Larson filed her Charge with the EEOC.

30.      On or about October 14, 2016, Plaintiff Horowitz filed a Charge of Discrimination with the EEOC.  Attached hereto, incorporated herein and marked as Exhibit "B" is a true and correct copy of Plaintiff Horowitz's EEOC Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

31.      More than sixty days have passed since Plaintiff Horowitz filed his Charge.

32.      On or about October 14, 2016, Plaintiff Pollard filed a Charge of Discrimination with the EEOC.  Attached hereto, incorporated herein and marked as Exhibit "C" is a true and correct copy of Plaintiff Pollard's EEOC Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

33.      More than sixty days have passed since Plaintiff Pollard filed his Charge.

34.      On or about November 18, 2016, Plaintiff Sweeney filed a Charge of Discrimination with the EEOC.  Attached hereto, incorporated herein and marked as

Exhibit "D" is a true and correct copy of Plaintiff Sweeney's EEOC Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

35.     More than sixty days have passed since Plaintiff Sweeney filed her Charge.

36.     On or about April 25, 2017, Plaintiff Seaman filed a Charge of Discrimination with the EEOC.  Attached hereto, incorporated herein and marked as Exhibit "E" is a true and correct copy of Plaintiff Seaman's EEOC Charge (with minor redactions for purposes of electronic filing of confidential/identifying information).

37.     More than sixty days have passed since Plaintiff Seaman filed her Charge.

38.     Plaintiffs have fully complied with all administrative prerequisites for the commencement of this action.

## IV.     FACTUAL ALLEGATIONS SUPPORTING AGE DISCRIMINATION CLAIMS

39.     AT&T has engaged in a pattern and practice of age discrimination adversely affecting the Named Plaintiffs and similarly situated Older Workers.

40.     AT&T by its actions intentionally discriminated against Older Workers, including Named Plaintiffs.

41.     AT&T's actions have resulted in a disparate impact against Older Workers, including Named Plaintiffs.

### 2020 Plan:  *AT&T's Expressed Intention Of Transforming Its Aging Workforce*

42.     AT&T maintains a corporate culture of age discrimination that emanates from the highest levels of the company.

43.     AT&T at the highest levels has publicly discussed its displeasure at having an older workforce, its intention to transform the company for the "future," and its desire

and expectation that older workers will leave its workforce.

44.     AT&T came up with a corporate-wide plan to replace its aging workforce with a younger one by the year 2020.

45.     In connection with its 2020 plan, AT&T's Chief Executive Officer, Randall Stephenson, has publicly discussed that AT&T has an aging workforce and had a need to reinvent the company.  *See Gearing Up for the Cloud, AT&T Tells Its Workers:  Adapt or Else,* http://www.nytimes.com. (Feb. 13, 2016).

46.     CEO Stephenson has publicly expressed his expectation that many older workers will exit the AT&T workforce by 2020, which he considered to be a positive thing for the company.

47.     During a "town hall" meeting/webcast discussing "2020," CEO Stephenson told AT&T employees that "we'll be here, but some of you won't be."

48.     AT&T's Chief Strategy Officer, John Donovan, has publicly discussed AT&T's "sprint to reinvent itself" in an article entitled "AT&T's Talent Overhaul."  In the article, CSO Donovan noted that the average tenure at the company is 22 years if you don't include people working at call centers, and that most of AT&T's employees were educated and trained "in a different era." In these same comments, CSO Donovan noted that AT&T has redesigned its "talent practices," by, among other things, redesigning compensation so that it "de-emphasized seniority."

49.     As part of its "2020" plan to reinvent its aging workforce by the year 2020 into a workforce for the jobs of tomorrow with skills for the "future,"  AT&T has publicly expressed age-based stereotypes and has acknowledged that those age-based stereotypes are considered in workplace decisions.  *See, e.g., AT&T Prepares for a*

*New World of Work:  The Changing Work Force (Part 2)*,
https://networkingexchangeblog.att.com/enterprise-business (dividing its workforce by
age, characterizing "Baby Boomers" as the workforce of "Yesterday," expressing without
stated basis what is important to "Baby Boomers" as distinct from "Gen X" and "Gen Y"
workers, explicitly stating that AT&T is taking these age-based stereotypical "factors into
account when planning for our workplace of the future," and stating that by 2015, 90%
of new hires will be from Gen X and Gen Y).

50.     AT&T promotes age-defined "Employee Resource Groups," including a
group for "Young Professionals" and separate group for "Over 50" Professionals.
Among other things, AT&T publicly states that the mission of its Group for "Young
Professionals" is to increase retention, and that the "Workforce 2020:  Better Together"
initiative of the "Over 50" group is for "preparing younger managers to lead an age
diverse workforce."

51.     As part of its company-wide "2020" plan to transform its aging workforce,
AT&T has for several years conducted vast involuntary group terminations with the
intent and effect of eliminating older workers from its workforce.

52.     A federal jury sitting in the Eastern District of Pennsylvania  in January,
2016, found that AT&T Services, Inc. discriminated against an employee because of his
age in violation of the ADEA when it decided in 2013 to "surplus" his employment in
connection with a reduction in force.  *Gerundo v. AT&T, Inc., et al.*, U.S.D.C., E.D. Pa.;
civil action no. 14-5171 (verdict was entered as a judgment and upheld by the district
court following post-trial motions (see docket no. 127)).  At the time of Mr. Gerundo's
"surplus," AT&T had in effect its "2020 plan," which was about changing the entire

12

direction of the company in which, it was said, they looked to "skills for the future."  *See Gerundo v. AT&T,* 5:14-cv-05171 (docket entry no. 127 at p. 14; docket entry no. 95 at 166, 181-184).

53.    AT&T's age-biased "2020 plan" has remained in effect since at least as early as 2013 and continues to this day.

*Transforming Its Aging Workforce By Three-Step*
<u>*"Surplus," Then Termination And Fraudulent Release Scheme*</u>

54.    Since at least as early as May 20, 2015, AT&T has implemented its age discriminatory 2020 plan by a company-wide three-step "surplus," then termination and fraudulent release scheme.

55.    AT&T's discriminatory plan and scheme involves notification of "surplus" status, a period during which "surplussed" employees remain employed and try to secure alternative positions with AT&T, and the presentation of a fraudulent "General Release and Waiver" that AT&T knows does not comply with the OWBPA and does not release or waive an employee's claims and rights under the ADEA.

56.    AT&T's three-step "surplus," then termination and fraudulent release scheme is infected with age bias.

57.    Using a standard form and uniform AT&T Surplus Notification Letter, AT&T notifies certain employees that the company has been "evaluating certain business units within the AT&T family of companies.  After a thorough and careful review, we have determined that the position which you currently hold will be eliminated. This is due to a reduction in positions within your level and organization.  As a result of this decision, you will be placed on surplus status, effective the day following the date that appears at the top of this letter, and you may receive severance benefits if you

meet the eligibility criteria."

58.    Decisions as to who will be placed on surplus status are subjective and subject to age discriminatory bias.

59.    Upon information and belief, an employee's Net Credited Service ("NCS") date, indicating years of service (and thus a proxy for age), is provided to decision-makers as part of the "surplus" decision for no apparent or good reason.

60.    AT&T's stated reason given to Older Workers, including Named Plaintiffs, for the surplus notification is exactly the same for everyone.  It is a pretext for age discrimination.

61.    In its AT&T Surplus Notification Letter, AT&T informs the "surplussed" employee that in order to receive payments under the AT&T, Inc. Severance Pay Plan, he or she must execute a General Release and Waiver, which may not be signed until on or up to 90 days after his or her last day of employment.

62.    On that same day of initial "surplus" notification, and as part of a standard, uniform package, AT&T presents to employees a "General Release and Waiver," which is an AT&T standard form document marked as "GR&W-AT&T-Non-CA-GG – Amended September 2014," identical in terms except for the reference to the recipient's for payroll purposes (*i.e.*, W-2 issuing) company.

63.    The General Release and Waiver purports to release all claims against AT&T with respect to the recipient's employment and termination of employment, and to waive the right to bring or participate in a class, collective or representative action on claims arising prior to signing, including under the ADEA.

64.    The General Release and Waiver was accompanied by an AT&T standard form, identical notice document, stamped on the bottom as "Amended September 2014" and entitled "AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) INFORMATION NOTICE UNDER THE OLDER WORKERS BENEFIT PROTECTION ACT" (the "ADEA/OWBPA Notice").

65.    AT&T states that the ADEA/OWBPA Notice includes as an attachment an ADEA Listing that "provides the ages and job titles of persons in the Decisional Unit who were and were not selected for participation in the Plan."

66.    AT&T's statement is patently false.  The "Plan" refers to the AT&T, Inc. Severance Pay Plan, in which *only* terminated employees may participate.  The ADEA Listing precedes the actual termination date; at the time it is provided, *no one* on the list is eligible to participate in the Plan.

67.    If an employee who has been notified of "surplus" status has not secured an alternative position by the end of the surplus period, their employment is then terminated.

68.    The application and selection for available position process is infected with age bias.

69.    During the period in which the "surplussed" employees are to secure an alternative position with AT&T, managers at their discretion may send Career Opportunity Notices ("CON") to only certain, not all, employees who have been selected for surplus, thus allowing managers to act on age bias and selectively notify younger employees of opportunities.

70.    Further, the AT&T "hiring" manager is automatically made aware if an

application has come from an employee who has already been selected for "surplus," thus indicating the company's previously expressed desire to end his or her employment.

71.     Upon information and belief, the AT&T "hiring" manager is also aware of the applicant's NCS date.

72.     The AT&T "hiring" manager, with knowledge of an applicant's service date (proxy for age) and "surplus" status, is given discretion on filling the available position, thus allowing the "hiring" manager to act on age bias.

73.     Applications for available positions may be rejected without explanation to the "surplussed" employee.

74.     Older "surplussed" employee applicants are often not even interviewed for available positions for which they are qualified.

75.     While executing massive termination of long-serving employees, AT&T actively recruits and hires externally.

76.     Internal postings for vacant positions may be "cancelled" without explanation, and then advertised externally and filled with younger outside hires.

77.     During the "surplus" period, many employees who were notified of "surplus" status, including those under age 40, secure available positions.

78.     During the "surplus" period, non-"surplussed" employees, including those under age 40, are moved into available positions under the guise of "reorganization" or changing of titles.

79.     At the conclusion of the surplus period, an employee who was placed on surplus status who has not landed an alternative position is terminated.

80.     In order to receive severance under the AT&T, Inc. Severance Pay Plan, the terminated employee must then sign the General Release and Waiver -- which was originally presented to the employee prior to the surplus/application period, but for which no new or supplemental "ADEA Listing" or OWBPA disclosures are provided.

81.     Although purporting to be a "General Release and Waiver," including a general release of all claims under the ADEA and a waiver of the right to bring and/or participate in a collective and/or representative action under the ADEA, AT&T knew that it was not.

82.     The General Release and Waiver is invalid and unenforceable as to rights and claims under the ADEA.  It contains material misstatements of fact, is misleading, is not knowing and voluntary, and fails to comply with the strict disclosure requirements of the OWBPA. Without limitation:

(a)     The General Release and Waiver contains false statements of material fact.  Without limitation, it falsely represents that the recipient has "been provided with a notice as required by the Older Workers Benefit Protection Act that contains information about the decisional unit involved, eligibility factors for participation in the Plan [the AT&T, Inc. Severance Pay Plan], time limits applicable to the Plan, and the job titles and ages of the employees designated to participate in the Plan and the job titles and ages of all individuals in the same decisional unit who have not been designated to participate in the Plan."

(i)     The description of the "eligibility factors" provided in the ADEA Listing falsely states that AT&T, Inc. Severance Pay Plan covers management employees who have been "designated" for company initiated involuntary termination and "designated as participants" in the Plan.  In fact, the AT&T, Inc. Severance Pay Plan covers only employees who have actually been terminated from employment. Among other things, and without limitation, the Plan specifically lists among its eligibility factors than an employee has properly executed a General Release

and Waiver of all rights and claims relating to the employee's employment and termination, which by the very terms of the General Release <u>cannot</u> be properly executed until the individual is actually terminated.

(ii)     The OWBPA requires that the employer seeking a waiver must provide the "job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organization who are not eligible or selected for the program." AT&T's providing the job titles of those "designated to participate" in the Plan <u>is not "as required" by the OWBPA</u>. That AT&T provided to the employees an ADEA Listing of employees purported to have been designated for participation" in the AT&T, Inc. Severance Pay Plan does not comport with the OWBPA's requirement as, at the time the List is provided, the "designated" employees are <u>known by AT&T</u> not to be "eligible" for the Plan, and <u>known not to be selected among those eligible.</u>

(b)     The General Release and Waiver was not written in a manner calculated to be understood by the recipient.

(c)     The ADEA/OWBPA Notice falsely states that the ADEA Listing, which it notes was included in the Surplus Notification documentation (and thus known to have preceded any actual terminations), "provides the ages and job titles of persons in the Decisional Unit who were and were not selected for participation in the Plan." AT&T knows that at the time the Listing was provided the "selected" employees <u>cannot participate</u> in the Plan because they are not eligible to do so.

(d)     AT&T did not provide the disclosures for the employment termination program as required by the OWBPA.

(e)     The disclosures AT&T did provide were not written in a manner calculated to be understood by the average recipient.

(f)     AT&T did not provide to the Older Workers the "job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organization who are not eligible or

selected for the program" as required by the OWBPA.  On the contrary, AT&T provided to the employees an ADEA Listing of employees <u>who were known by AT&T not to be "eligible" for the Plan, and known not to be selected among those eligible.</u>

(g)     The "ADEA Listing" containing <u>the job titles and age information that was provided to the terminated employees was not given at the commencement of the General Release and Waiver consideration period as explicitly required by the OWBPA.</u>  AT&T provided no new or additional "ADEA Listing" and/or jobs and titles age information at the commencement of the General Release and Waiver consideration period.

(h)     AT&T never provided to the employees information pertaining to actual terminations of employment.  Nor did AT&T ever indicate to the employees that the information previously provided was still accurate or applicable as to actual terminations.

(i)     AT&T did not properly identify the class, unit or group of individuals covered by the employment termination program.

(j)     AT&T did not identify the eligibility factors or criteria used to determine which employees would be terminated from the company.

(k)     AT&T did not identify the eligibility factors or criteria used to determine which employees would be placed on "surplus" status.

(l)     The "eligibility" information that AT&T provided as to the AT&T, Inc. Severance Pay Plan was false and misleading.  AT&T did not accurately identify the eligibility requirements for the AT&T, Inc. Severance Pay Plan.

(m)     AT&T knowingly provided demographic information that did not include information as to actual terminations, and which hid discrimination that occurred after the "surplus" notification and concealed the actual age impact of the terminations.

(n)     AT&T did not properly identify the decisional unit considered for termination.

(o)     The information provided in the "ADEA Listing" was for a "Decisional Unit" identified by the name of a person.  However, there was no information explaining what this "Decisional Unit" identification meant, and no information provided as to how this Decisional Unit was determined or who was assigned to it.

(p)     The "ADEA Listing" contains certain job titles followed by asterisks, but no explanation as to what the asterisks mean.

(q)     AT&T indicated that it provided disclosures on "individuals" or "persons," within the Decisional Unit, but did not indicate whether it was providing age and job title information for those formally classified as AT&T employees or whether the information included those individuals working for AT&T but formally classified as "contractors."

(r)     The ADEA Listing contains an undefined category entitled "AWG."  Neither the ADEA Listing nor the ADEA/OWBPA Notice informed the recipients what "AWG" indicates, to which AWG the recipient was assigned and why, why others were assigned different AWG numbers, and why many of those on the list had no assigned AWG number.

(s)     Upon information and belief, AWG refers to "Affected Work Group" and indicates those who were possibly impacted by a "surplus."  AT&T provided to the recipient no information as to the basis a particular AWG number (or none at all) was assigned and why those with different or no AWGs are grouped together for purposes of the ADEA Listing.

(t)     AT&T did not properly identify the time limits applicable to the group termination program.

(u)     The General Release and Waiver is effectively an improper prospective waiver of claims and rights under the ADEA, as the information supposedly provided to permit an employee to make an informed decision necessarily precedes the execution date and the age discriminatory application and selection for available position process.

(v)     The "ADEA Listing" was marked on each page as "AT&T Proprietary (Restricted) authorized individuals only," thereby attempting to discourage terminated older workers from sharing the information with an attorney or other AT&T employees, as the federal age discrimination law contemplates.

83.     AT&T intentionally executed its discriminatory 2020 plan by conducting its "surplus" then termination and fraudulent release scheme s in waves over a period of time, concealing the true extent of its actions and denying the terminated employees

access to complete lists of the ages and titles of all those affected.

84.     AT&T hid from its terminated Older Workers the scope and age impact of the massive 2020 reduction.

85.     AT&T purposefully concealed from its terminated Older Workers the demographic data as to actual terminations because, upon information and belief, the termination data would reveal age bias.

86.     AT&T knowingly presented to its Older Workers a "General Release and Waiver" that the company knew could not be a knowing and voluntary waiver.

87.     The purported waiver of claims and right to bring and/or participate in a collective and/or representative action under the ADEA presented to Older Workers is invalid, unenforceable, and in violation of the OWBPA.

88.     AT&T knowingly and falsely represented to Older Workers that the General Release and Waiver was a release and waiver of rights and claims under the ADEA, when AT&T knew that it was not.

*AT&T Has Intentionally Harmed Older Workers By Presenting Them With*
*Fraudulent, False, and Misleading General Release And Waivers Agreements*

89.     AT&T kept company-wide computer-based information that tracked all actions in connection with its employees, including whether they were "surplussed," applied for positions, and were terminated.

90.     AT&T had the ability to easily supplement the "ADEA Listing" information provided to its employees, and did so on occasion.

91.     In presenting fraudulent General Release and Waivers to the forty year old and older workers who were terminated in connection with the "surplus" notification, AT&T attempted to harm Older Workers by, *inter alia* and without limitation: a) giving

them false information as to the age impact of the terminations; b) causing them to falsely believe that they could not pursue a claim of age discrimination if they signed the General Release and Waiver; and c) depriving those who would pursue an action the benefit of the participation of other victims of AT&T's discrimination.

92.    The fraud committed by AT&T by telling the terminated employees that they were releasing and waiving ADEA claims and rights when they were not releasing and waiving and, in fact, retained such claims and rights, **operated only to the detriment of workers aged 40 and over and only misled workers aged 40 and over.**  There are no requirements for the form or content of a waiver being provided to terminated employees under the age of 40.  Moreover, workers under the age of 40 are not protected by the ADEA and, therefore, have no claims or potential claims under that statute.

93.    A non-fraudulent release and waiver agreement would have stated that the Older Workers and the Named Plaintiffs were releasing AT&T of any and all claims and waiving the right to bring or participate in all class, collective or representative actions **except for** such claims and rights under the Age Discrimination in Employment Act because AT&T had chosen not to provide the information required by the Older Workers Benefit Protection Act.

94.    Thus, for years now and, it is believed, continuing until the present, AT&T has undertaken a fraudulent scheme whereby the company has intentionally targeted Older Workers for termination, has actively recruited younger outside hires, has knowingly and falsely misled terminated older workers as to the age impact of the terminations, has knowingly and falsely made misstatements of material fact to the

Older Workers, and knowingly and falsely told the Older Workers that if they signed a
release and waiver agreement to receive severance, the Older Workers had released
and waived and their claims and rights to bring a federal age discrimination claim
challenging their terminations.

95.    AT&T's fraudulent deception means that there is a great and untold
number of Older Workers unaware that they have actually retained the right to pursue
an action against AT&T under the ADEA.

96.    AT&T intentionally discriminated against Older Workers, including Named
Plaintiffs, when it, without limitation, selected them for "surplus" status, denied them
opportunities and/or rejected their applications for available positions, terminated their
employment, and presented them with what purported to be a General Release and
Waiver but was known to violate the OWBPA.

97.    AT&T's 2020 plan has resulted in a disparate impact in connection with
the termination of Older Workers, including Named Plaintiffs.

98.    AT&T's three-step "surplus," then termination and fraudulent release
scheme has resulted in a disparate impact on Older Workers, including Named
Plaintiffs.  Without limitation, the process by which AT&T selected employees for
surplus, the process by which AT&T notified and/or selected "surplussed" employees in
connection with available positions, and the presentation of fraudulent releases to
terminated employees, together and/or separately had a disparate impact on Older
Workers, including Named Plaintiffs.

99.    Unless AT&T's fraudulent deception is rectified by this Court, a great and
untold number of Older Workers who were unlawfully terminated because of their age

will never know that they can in fact bring an action against AT&T for age discrimination; further, Named Plaintiffs will be deprived of the benefit of their participation.

<u>Plaintiff Linda Larson</u>

100.   Plaintiff Larson was hired by AT&T in or about 1973 and was employed by the company for approximately 34 years before AT&T terminated her employment effective March 7, 2016 at the age of 61.

101.   From 2013 until the time of her termination, Plaintiff Larson held the position of Manager of Sales Planning and reported to Glen Greenwell (approximate age 42).

102.   At the time of her termination, Plaintiff Larson worked for AT&T from her home in Lake Havasu City, Arizona.

103.   Plaintiff Larson received a W-2 from AT&T Services, Inc.

104.   Plaintiff was a highly qualified and dedicated employee of AT&T for more than 34 years.  Her outstanding performance was recognized by AT&T and praised by her managers and co-workers.  Without limitation:

    a.    Throughout her 34 years with AT&T, every one of the overall ratings in her performance appraisals has been "Fully Meets" or better.

    b.    She received several promotions throughout her AT&T career and consistently received merit increases, including for 2015.

    c.    In addition to a Company Performance Incentive bonus, AT&T awarded to Plaintiff Larson in 2015 an Individual Performance Incentive bonus, a recognition of outstanding performance given to only approximately the top two percent (2%) of the AT&T workforce.

    d.    In 2008, AT&T named Plaintiff Larson a Summit Award honoree for 2007.  AT&T stated that it "selected [her] for this prestigious honor

by our organization's leadership for [her] outstanding support of Specialized Markets."

105.    In her most recent performance review in or about July 2015, AT&T assigned to Plaintiff Larson a "Fully Meets" Rating for "Business Results" rating; an "Exceeds" for "Leadership" rating; and an overall rating of "Fully Meets."

106.    In the performance appraisal, Plaintiff Larson's Manager, Mr. Greenwell, commented, among other things:

> As the year progressed I put more on Linda, and no matter the request Linda always came through....

> Linda has been a standout SPM [Sales Planning Manager], and contributed in Daily Reporting, Service Delivery reporting, Funnel Maintenance, Sales Tracking, and numerous other ways....

> I turn to Linda when I need someone to get a task completed. I could not ask any more from Linda this year....

> Linda is valued as a leader in the organization, and continues to deliver in ways that go beyond the scope of her responsibilities.

107.    In approximately December, 2015, AT&T announced the possibility of a "surplus" event in the Global Sales Operations organization and attempted to elicit individuals for voluntary terminations.  Upon information and belief, this was an attempt to induce older workers to voluntarily retire before they were terminated on an involuntary basis.

108.    After a "surplus" event was announced and AT&T stated that positions in her organization would be eliminated, AT&T posted a Job Requisition (No. 1560021) seeking someone to fill the Sales Planning Manager position, which Plaintiff Larson held.

109.   On or about January 7, 2016, in a form letter (identified as GG-ATT-SNL-1, August 2015), AT&T notified Plaintiff Larson that the position that she currently held "will be eliminated ...due to a reduction in positions within your level and organization." As a result, it said, she was being placed on "surplus status."

110.   AT&T's statement that Plaintiff Larson's position was being eliminated was false and a pretext for age discrimination.

111.   When Plaintiff Larson's manager, Mr. Greenwell, informed Plaintiff Larson that AT&T had selected her for "surplus" status, he indicated that he had no input into her selection and was upset that she had been selected.

112.   Following her inquiry, Plaintiff Larson was told by Janice Rau, HR Business Partner, that performance, leadership, skills and experience, weighted equally, were the criteria used for rating and ranking in the selection of individuals for surplus.

   a.   All of these are areas in which Plaintiff Larson consistently received high praise.

   b.   Based on, *inter alia*, her last formal performance appraisal in which she received an overall score of "Fully Meets," and a leadership rating of "Exceeds," and the recognition by AT&T of her outstanding performance, results and positive contributions to the company over an 34 year career, any fair and unbiased assessment of these criteria would have resulted in her top rating/ranking and not in her selection for "surplus" status.

113.   Following her surplus notification, Mr. Greenwell indicated that he would try to extend Plaintiff Larson's employment beyond the 60 day surplus period because he needed Plaintiff Larson to work on projects.  Notwithstanding his need and the expressed need of others for Plaintiff Larson's services, AT&T would not permit an extension of Plaintiff Larson's employment beyond the 60 day surplus period.

114.    Following her selection for surplus, Plaintiff Larson was required to train younger workers who had been retained in the Manager, Sales Planning position including, without limitation, Tricia McCann (approximately age 41-42).

115.    On that same date, January 7, 2016, AT&T presented to Plaintiff Larson a "General Release and Waiver," which was an AT&T standard form document marked as "GR&W-AT&T-Non-CA-GG – Amended September 2014).

116.    The General Release and Waiver was accompanied by the AT&T ADEA/OWBPA Notice and an ADEA Listing.

117.    According to the ADEA Listing, there were 2069 individuals referenced in the Decisional Unit; of those, 83 were selected for "surplus."  The average age of those included in the "Decisional Unit" (never properly identified or explained) was 49.74, but the average age of those individuals in the "Decisional Unit" selected for surplus was 53.6.

118.    Plaintiff Larson was apparently assigned to AWG 21.  Upon information and belief, "AWG" refers to "Affected Work Group" (never properly explained or identified, but believed to refer to only those possibly impacted).  AT&T never told Plaintiff Larson the basis of her or others' assignment to AWG 21.

119.    Per the ADEA Listing, there were 203 people assigned to AWG 21.  The average age of those in AWG 21 was 48.73, but the average age of those in AWG 21 selected for surplus was 54.63.

120.    Per the ADEA Listing, there were 129 people in AWG 21 who held the position of "Manager, Sales Planning." The average age of those holding the position of Manager, Sales Planning was 49.6, but the average age of the Managers, Sales

Planning selected for surplus was 57.83.

121.    Per the ADEA Listing, of the 129 people who held the position of Manager, Sales Planning, 12 were selected for surplus.  Every one of the individuals holding the position of Manager, Sales Planning that was selected for surplus was age 40 or over.

122.    Per the ADEA Listing, those holding the position of Manager, Sales Planning were selected for surplus at a rate of approximately 9.3%.  Those under age 40 are underrepresented in this group.  Further, those 60 and over made up about 8.5% of the group, yet made up approximately 41% of those selected for surplus.

123.    Per the ADEA Listing, Respondents did not select for surplus 113 people in the position of Manager, Sales Planning who were younger than Plaintiff Larson, including many who were substantially younger.

124.    Based on, *inter alia,* her knowledge, skills, experience and outstanding track record with AT&T as a Manager, Sales Planning, Plaintiff Larson was at least as, or better, qualified than the 113 younger people retained in the position of Manager, Sales Planning.

125.    Following her "surplus" notification, and notwithstanding her outstanding credentials, experience and track record of success, no AT&T manager sent Plaintiff Larson a CON advising her of open positions and seeking her application.

126.    After she was notified of her "surplus" status, Plaintiff Larson applied for at least two (2) open and available positions with AT&T for which she was qualified. Without limitation:  a) on or around February 9, 2016, she applied for the position of Manager of Sales Performance Reporting; and b) on or around February 18, 2016, she applied for the position of Mgr, Sale Perf Reporting.

127.    AT&T did not interview Plaintiff Larson or select her for either one of these positions.

128.    AT&T terminated Plaintiff Larson's employment effective March 7, 2016.

129.    AT&T had instructed Plaintiff Larson that in order to receive a severance payment under the AT&T, Inc. Severance Pay Plan, she was then required to sign the General Release and Waiver within 90 days of her termination.  However, AT&T provided to Plaintiff Larson no additional or supplemental ADEA Listing, and never told Plaintiff Larson the job titles and ages of those among the 83 "surplussed" employees which ones were actually terminated.

130.    Although the General Release and Waiver stated that it was a general release of all claims and waiver of all rights, including under the ADEA, AT&T knew that this was a false representation.  As set forth above in ¶¶ 81-88, the General Release and Waiver contained misstatements of fact, was misleading, was not knowing and voluntary, and failed to comply with the strict disclosure requirements of the OWBPA.

131.    Plaintiff Larson did not sign the General Release and Waiver.

132.    Plaintiff Larson was the oldest of the eight (8) Sales Planning Managers who reported to Mr. Greenwell.  Of the eight (8) Sales Planning Managers in her group reporting to Mr. Greenwell, AT&T terminated Plaintiff Larson (61) and another (age 56).

133.    AT&T retained several people younger than Plaintiff Larson in the Manager Sales Planning position, including some who performed the same functions as Plaintiff Larson.  AT&T retained, without limitation, Tricia McCann (approximately 41-42), Pennie Kilpatrick (51), Toni Hennessey (approximately 53), Sally Flayer (59), Tony Degeisio (56), and Eric Brigance (approximately 40).

134.    Based on, *inter alia,* her knowledge, skills, experience, and outstanding track record with AT&T, Plaintiff was at least as, or better, qualified than these younger individuals who were retained.  Without limitation:

    a.    AT&T retained Trish McCann (approximately 41-42) to perform the same functions that Plaintiff Larson did.  After her surplus notification, Plaintiff Larson was required to train Ms. McCann.  Ms. McCann was far less qualified, experienced, and knowledgeable than Plaintiff Larson.  In fact, Ms. McCann frequently asked Plaintiff Larson for her help in the performance of her job duties.

135.    Plaintiff's Larson's performance did not warrant her selection for "surplus," the fact that she was not selected for open positions, or the termination of her employment by AT&T.

136.    The reason that Plaintiff Larson was selected for "surplus," presented with a false and fraudulent release, not selected for open positions, and/or the termination of her employment was because of her age.

137.    AT&T intentionally discriminated against Plaintiff Larson because of her age.

138.    Plaintiff Larson's age was a determinative factor in connection with AT&T's decisions to select her for "surplus," present her with a false and fraudulent release, not to select her for available positions and/or to terminate her employment.

139.    Upon information and belief, AT&T's "2020" plan and/or its implementation by AT&T's three-step "surplus," then termination and fraudulent release scheme, collectively and/or individually, had a disparate impact on workers age 40 or over, including Plaintiff Larson.

140.    As a direct result of Defendant's discriminatory conduct, Plaintiff Larson has in the past incurred, and will in the future incur, a loss of earnings and/or earnings

capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

<u>Plaintiff Roy Horowitz</u>

141.    Plaintiff Horowitz was hired by AT&T in or about December, 1995, and was employed by the company for more than 20 years before AT&T terminated his employment effective June 21, 2016 at the age of 56.

142.    From approximately 2014 until the time of his termination, Plaintiff Horowitz held the position of Professional – Client Services Project Manager and reported to Peter Marcinkowski, AT&T Senior Program Project manager (approximately age 45).

143.    At the time of his termination, Plaintiff Horowitz worked for AT&T in its Bedminster, New Jersey office.

144.    Plaintiff Horowitz received a W-2 from AT&T Corp.

145.    Plaintiff Horowitz was a highly qualified and dedicated employee of AT&T for more than 20 years.

146.    Among other qualifications, Plaintiff Horowitz has a B.S. in Commerce, Management and Organizational Behavior, a Masters Certification – Project Management, a Six Sigma Green Belt from AT&T Six Sigma Center of Excellence, and extensive training and several certifications in the project management, leadership and technology areas.

147.    Plaintiff Horowitz's outstanding value to the company was recognized by AT&T.  Among other things, and without limitation:  Plaintiff Horowitz received annual merit pay increases, and was as an AT&T employee the recipient of the President of the

United States Volunteer Service Award, Silver Level, for many years.

148.    In his last formal performance review, completed for 2015, AT&T assigned to Plaintiff Horowitz an overall performance rating of "Fully Meets."  The review noted, *inter alia,* that Plaintiff Horowitz "[d]isplays high integrity, honesty and a deep sense of caring for the success of our company, customers and employees."

149.    Plaintiff Horowitz had demonstrated his willingness, commitment, and ability to stay up to date and master the latest technology that AT&T deemed appropriate for its jobs of the "future."  Among other things, and without limitation, Plaintiff Horowitz had completed more than 111 courses in 2015 and through his termination in 2016, including the AT&T Technology and Operations – Leadership Transformation Program.  He had 100% completion of all technical project management AT&T Workforce 2020 career track certification courses.  He earned numerous industry recognized certifications, including one for Agile Bootcamp Mythology and Practices in October, 2015.

150.    On or about April 14, 2016, AT&T posted externally and sought applications for a Professional Client Services Proj Mgmt position, the position held by Plaintiff Horowitz.

151.    On or about April 22, 2016, by its Surplus Notification Letter (identified as GG-ATT-SNL-1, August 2015), AT&T notified Plaintiff Horowitz that the position that he currently held "will be eliminated" ...." due to a reduction in positions within your level and organization."  As a result, it said, he was being placed on "surplus "status."

152.    AT&T's statement that Plaintiff Horowitz's position was being eliminated was false and a pretext for age discrimination.

153.    On that same date, April 22, 2016, AT&T presented to Plaintiff Horowitz a "General Release and Waiver," which was an AT&T standard form document (marked as "GR&W-AT&T-Non-CA-GG – Amended September 2014).

154.    The General Release and Waiver was accompanied by the AT&T ADEA/OWBPA Notice and an ADEA Listing.

155.    Per the ADEA Listing, the average age of those listed in the "Decisional Unit" (never properly identified or explained) was 48.  The average age of the employees selected for surplus was 61.5.

156.    Per the ADEA Listing, the average age of those listed in the "Decisional Unit" who were assigned to an Affected Work Group (never properly identified or explained, but believed to be only those possibly impacted) was 55, as compared to an average age of 48 for the entire Decisional Unit.

157.    Per the ADEA Listing, of those assigned to an AWG, those age forty and older were not selected for "surplus" (*i.e.,* definitely retained) at a rate less than 80% of those under age 40 who were not selected for surplus.

158.    Plaintiff Horowitz was apparently assigned to AWG 2.  AT&T did not tell him the basis of his or others' assignment to AWG 2.

159.    Per the ADEA Listing, all of the twelve employees in AWG 2 had the title "Professional – Client Services Proj Mgmt."  AT&T selected for "surplus" status Plaintiff Horowitz (age 56) and Plaintiff Pollard (age 69).   AT&T did not select for surplus six people younger than Plaintiff Horowitz in a Professional – Client Services Proj Mgmt position, including people substantially younger than Plaintiff Horowitz.

160.    Based on, *inter alia,* his 20.5 years of experience with AT&T, outstanding

track record, knowledge, and skills,  Plaintiff Horowitz was at least as, or better,

qualified for the Professional – Client Services Mgmt position than the six younger

people who were not selected for surplus and who remained in the Professional -- Client

Services Mgmt position.

161.   Following his "surplus" notification, and notwithstanding his outstanding

credentials, experience, and track record of success, no AT&T manager sent Plaintiff

Horowitz a CON informing him of open positions and seeking his application.

162.   Upon information and belief, the April 16, 2016, opening for a Professional

Client Services Proj Mgmt position was advertised only externally and not posted on

AT&T's internal job posting website to which the employees selected for surplus were

directed.

163.   Following his "surplus" notification, Plaintiff Horowitz applied for three

open and posted AT&T positions for which he was qualified, but was not even

interviewed.

164.   On June 21, 2016, AT&T terminated Plaintiff Horowitz's employment.

165.   AT&T had instructed Plaintiff Horowitz that in order to receive a severance

payment under the AT&T, Inc. Severance Pay Plan, he was then required to sign the

General Release and Waiver within 90 days after his termination.  However, AT&T

provided to Plaintiff Horowitz no additional or supplemental ADEA Listing, and never

told Plaintiff Horowitz the job titles and ages of those among the "surplussed"

employees that were actually terminated.

166.   Although the General Release and Waiver stated that it was a general

release of all claims and waiver of all rights, including under the ADEA, AT&T knew that

this was a false representation.  As set forth above in ¶¶ 81-88, the General Release and Waiver contained misstatements of fact, was misleading, was not knowing and voluntary, and failed to comply with the strict disclosure requirements of the OWBPA.  In addition to the common deficiencies identified above, Plaintiff Horowitz's ADEA Listing was further confusing because it appeared to be exactly the same as that provided to Plaintiff Pollard, but noted different "as of" dates.

167.    Plaintiff Horowitz signed and returned to AT&T the General Release and Waiver on or about June 21, 2016.  However, the purported waiver of Plaintiff Horowitz's claims and right to bring and/or participate in a collective and/or representative action under the ADEA is invalid, unenforceable, and in violation of the OWBPA.

168.    Following Plaintiff Horowitz's termination of employment, AT&T retained at least six people younger than Plaintiff Horowitz in the Professional – Client Services Project Mgmt position in his "AWG" and within his "Decisional Unit," including several employees substantially younger than Plaintiff Horowitz.

169.    Based on, *inter alia,* his 20.5 years of experience with AT&T, outstanding track record, knowledge, and skills, Plaintiff Horowitz was at least as, or better, qualified for these positions than those individuals retained.

170.    AT&T retained at least one substantially younger employee who held the Client Services Project Mgmt position and reported to Mr. Marcincowski (Chris Talley, approximately 45).  Based on, *inter alia,* his 20.5 years of experience with AT&T, outstanding track record, knowledge and skills, Plaintiff was at least as or better qualified for this position than Mr. Talley.

171.   AT&T's termination of Plaintiff's employment was contrary to AT&T's frequently expressed policy of eliminating AT&T contract workers before terminating the employment of AT&T employees.  Upon information and belief, AT&T retained substantially younger contractors who worked as program managers for AT&T and reported to Mr. Marcincowski, including, without limitation, Archana Vyas (approximately 39).

172.   Plaintiff Horowitz's performance did not warrant his selection for "surplus," the fact that he was not interviewed or selected for open positions, or the termination of his employment.

173.   The reason that Plaintiff Horowitz was selected for "surplus," presented with a false and fraudulent release, not selected for open positions, and/or the termination of his employment was because of his age.

174.   AT&T intentionally discriminated against Plaintiff Horowitz because of his age.

175.   Plaintiff Horowitz's age was a determinative factor in connection with AT&T's decisions to select him for "surplus," present him with a false and fraudulent release, not to select him for available positions and/or to terminate his employment.

176.   Upon information and belief, AT&T's "2020" plan and/or its implementation by AT&T's three-step "surplus," then termination and fraudulent release scheme, collectively and/or individually, had a disparate impact on workers age 40 or over, including Plaintiff Horowitz.

177.   As a direct result of Defendant's discriminatory conduct, Plaintiff Horowitz has in the past incurred, and will in the future incur, a loss of earnings and/or earnings

capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

Plaintiff Kempten Pollard

178.    Plaintiff Pollard was hired by AT&T in or about May, 2006, and was employed by the company for more than 10 years before AT&T terminated his employment effective June 21, 2016 at the age of 69.

179.    From 2008 until the time of his termination, Plaintiff Pollard held the position of Professional – Client Services Project Manager.  Since approximately 2012, he reported to Peter Marcinkowski, AT&T Senior Program Project Manager (approximately age 45).

180.    When Mr. Marcinkowski became Plaintiff Pollard's manager in or about 2012 or 2013, Mr. Marcinkowski was aware of his age (then 65 or 66) and asked him about his retirement plans.  Plaintiff Pollard told Mr. Marcinkowski that he had no plans to retire.

181.    At the time of his termination, Plaintiff Pollard worked for AT&T from his home in Bradenton, Florida, and was officially assigned to an AT&T office in Tampa, Florida.

182.    Plaintiff Pollard received a W-2 from AT&T Services, Inc.

183.    Plaintiff was a highly qualified and dedicated employee of AT&T for more than ten years.

184.    Among other qualifications, prior to his hire by AT&T, Plaintiff Pollard had worked with AT&T as a program manager for IBM.  He has a degree in electrical engineering and over 45 years of experience in the energy industry.

185.    Plaintiff's outstanding value to the company was recognized by AT&T. Among other things, and without limitation, Plaintiff Pollard received annual merit pay increases and bonuses.

186.    In his last formal performance review, completed for 2015, AT&T assigned to Plaintiff Pollard an overall performance rating of "Fully Meets."  The review noted, *inter alia,* that Plaintiff Pollard "[d]isplays high integrity, honesty and a deep sense of caring for the success of our company, customers and employees."

187.    Plaintiff Pollard had demonstrated his willingness, commitment and ability to stay up to date and master the latest technology that AT&T deemed appropriate for its jobs of the "future."  He completed all of the "2020" training classes required to date.

188.    On or about April 14, 2016, AT&T posted externally and sought applications for a Professional Client Services Proj Mgmt position, the position held by Plaintiff Pollard.

189.    On or about April 22, 2016, by its Surplus Notification Letter (identified as GG-ATT-SNL-1, August 2015), AT&T notified Plaintiff Pollard that the position that he currently held "will be eliminated ....due to a reduction in positions within your level and organization."  As a result, it said, he was being placed on "surplus status."

190.    AT&T's statement that Plaintiff Pollard's position was being eliminated was false and a pretext for age discrimination.

191.    On that same date, April 22, 2016, AT&T presented to Plaintiff Pollard a "General Release and Waiver," which was an AT&T standard form document marked as "GR&W-AT&T-Non-CA-GG – Amended September 2014).

192.    The General Release and Waiver was accompanied by the AT&T ADEA/OWBPA Notice and an ADEA Listing.

193.    Per the ADEA Listing, the average age of those listed in the "Decisional Unit" (never properly identified or explained) was 48.  The average age of the employees selected for surplus was 61.5.

194.    Per the ADEA Listing, the average age of those listed in the "Decisional Unit" who were assigned to an Affected Work Group (never properly identified or explained, but believed to refer to only those possibly impacted) was 55, as compared to an average age of 48 for the entire Decisional Unit.

195.    Per the ADEA Listing, of those assigned to an AWG, those age forty and older were not selected for "surplus" (*i.e.,* definitely retained) at a rate less than 80% of those under age 40 who were not selected for surplus.

196.    Plaintiff Pollard, like Plaintiff Horowitz, was apparently assigned to AWG 2. AT&T did not tell him the basis of his or others' assignment to AWG 2.

197.    Per the ADEA Listing, all of the twelve employees in AWG 2 had the title "Professional – Client Services Proj Mgmt."  AT&T selected for "surplus" status Plaintiff Horowitz (age 56) and Plaintiff Pollard (age 69).   AT&T did not select for surplus ten people younger than Plaintiff Pollard in a Professional – Client Services Proj Mgmt position, including people substantially younger than Plaintiff Pollard.

198.    Based on, *inter alia,* his 45 years of experience, outstanding track record, knowledge and skills,  Plaintiff Pollard was at least as, or better, qualified for the Professional – Client Services Mgmt position than the ten younger people who were not selected for surplus and who remained in the Professional -- Client Services Mgmt

position.

199.   Following his "surplus" notification, and notwithstanding his outstanding credentials, experience and track record of success, no AT&T manager sent Plaintiff Pollard a CON informing him of open positions and seeking his application.

200.   Upon information and belief, the April 16, 2016, opening for a Professional Client Services Proj Mgmt position was advertised only externally and not posted on AT&T's internal job posting website to which the employees selected for surplus were directed.

201.   Following his "surplus" notification, Plaintiff Pollard applied for six open and posted AT&T positions for which he was qualified, but was not even interviewed.

202.   On June 21, 2016, AT&T terminated Plaintiff Pollard's employment.

203.   AT&T had instructed Plaintiff Pollard that in order to receive a severance payment under the AT&T, Inc. Severance Pay Plan, he was then required to sign the General Release and Waiver within 90 days after his termination.  However, AT&T provided to Plaintiff Pollard no additional or supplemental ADEA Listing, and never told Plaintiff Pollard the job titles and ages of those among the "surplussed" employees which ones were actually terminated.

204.   Although the General Release and Waiver stated that it was a general release of all claims and waiver of all rights, including under the ADEA, AT&T knew that this was a false representation.  As set forth above in ¶¶ 81-88, the General Release and Waiver contained misstatements of fact, was misleading, was not knowing and voluntary, and failed to comply with the strict disclosure requirements of the OWBPA.  In addition to the common deficiencies identified above, the ADEA Listing provided to

Plaintiff Pollard stated that it was as of 6-15-16.   This was false, as it was given to Plaintiff Pollard on April 22, 2016.  Further, Plaintiff Pollard's ADEA Listing was additionally confusing because it appeared to be exactly the same as that provided to Plaintiff Horowitz, but noted different "as of" dates.

205.   Plaintiff Pollard signed and returned to AT&T the General Release and Waiver on or about September 10, 2016.  However, the purported waiver of Plaintiff Pollard's claims and right to bring and/or participate in a collective and/or representative action under the ADEA is invalid, unenforceable, and in violation of the OWBPA.

206.   Following Plaintiff Pollard's termination of employment, AT&T retained at least ten people younger than Plaintiff Pollard in the Professional – Client Services Project Mgmt position in his "AWG" and within his "Decisional Unit," including several employees substantially younger than Plaintiff Pollard.

207.   Based on, *inter alia,* his 45 years of experience, outstanding track record, knowledge and skills, Plaintiff Pollard was at least as or better qualified for these positions than those individuals retained.

208.   AT&T retained at least four younger employees who held the Client Services Project Mgmt position and reported to Mr. Marcincowski, including one believed to be about 24 years younger than Plaintiff Pollard (Chris Talley).  Based on, *inter alia,* his 45 years of experience with AT&T, outstanding track record, knowledge and skills, Plaintiff was at least as or better qualified for this position than Mr. Talley.

209.   AT&T's termination of Plaintiff Pollard's employment was contrary to AT&T's frequently expressed policy of eliminating AT&T contract workers before terminating the employment of AT&T employees.  Upon information and belief, AT&T

retained substantially younger contractors who worked as program managers for AT&T and reported to Mr. Marcincowski, including, without limitation, Archana Vyas (approximately 39).

210.   Plaintiff Pollard's performance did not warrant his selection for "surplus," the fact that he was not interviewed or selected for open positions, or the termination of my employment.

211.   The reason that Plaintiff Pollard was selected for "surplus," presented with a false and fraudulent release, not selected for open positions, and/or the termination of his employment was because of his age.

212.   AT&T intentionally discriminated against Plaintiff Pollard because of his age.

213.   Plaintiff Pollard's age was a determinative factor in connection with AT&T's decisions to select him for "surplus," present him with a false and fraudulent release, not to select him for available positions and/or to terminate his employment.

214.   Upon information and belief, AT&T's "2020" plan and/or its implementation by AT&T's three-step "surplus," then termination and fraudulent release scheme, collectively and/or individually, had a disparate impact on workers age 40 or over, including Plaintiff Pollard.

215.   As a direct result of Defendant's discriminatory conduct, Plaintiff Pollard has in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

<u>Plaintiff Kathleen Sweeney</u>

216.   Plaintiff Sweeney was hired by AT&T in or about November, 1997, and was employed by the company for more than 18 years before AT&T terminated her employment effective July 22, 2016 at the age of 51.

217.   From 2007 until the time of her termination, Plaintiff Sweeney held the position of Director of Sales (from January, 2014 through April, 2015, she held the position of Director of Sales Operations).

218.   At the time of her termination, Plaintiff Sweeney reported to Judy Cavalieri, AT&T Vice President and General Manager – Liberty States (approximately age 49). Ms. Cavalieri had just been appointed to her position effective April 1, 2016. Prior to reporting to Ms. Cavalieri, Plaintiff Sweeney had reported to Tiffany Baehman, Vice President, General Manager of Liberty States (approximately age 46).

219.   At the time of her termination, Plaintiff Sweeney worked for AT&T in King of Prussia, Pennsylvania; she travelled for work to field offices in various states, including New Jersey, and sometimes worked for AT&T from her home in New Jersey.

220.   Plaintiff Sweeney received a W-2 from AT&T Mobility Services LLC.

221.   Plaintiff Sweeney was a highly qualified and dedicated employee of AT&T for more than 18 years.

222.   Among other qualifications, Plaintiff Sweeney has a B.S. in Business Administration and an outstanding track record of success in retail sales for AT&T.

223.   Plaintiff's extensive knowledge, skills, experience and record of achievement as a successful Director of Sales were recognized by AT&T. Among other things, and without limitation, she received annual merit increases and performance-based bonuses, every one of her annual performance reviews was "Fully Meets" or

better, and she was called upon by AT&T to serve as a mentor for team members in her area.

224.   In her last formal performance review, completed for 2015, AT&T assigned to Plaintiff Sweeney a business results rating of "Fully Meets," a leadership rating of "Exceeds," and an overall performance rating of "Fully Meets." The review noted, *inter alia,* that Plaintiff Sweeney had a "solid year," was a "change agent in the area of employee engagement" and a "thought leader for female leadership development."

225.   On or about May 23, 2016, by its form Surplus Notification Letter (identified as GG-ATT-SNL-1, August 2015), AT&T notified Plaintiff Sweeney that the position that she currently held "will be eliminated ....due to a reduction in positions within your level and organization." As a result, it said, she was being placed on "surplus status."

226.   AT&T's statement that Plaintiff Sweeney's position was being eliminated was false and a pretext for age discrimination.

227.   On that same date, May 23, 2016, AT&T presented to Plaintiff Sweeney a "General Release and Waiver," which was the AT&T standard form document marked as "GR&W-AT&T-Non-CA-GG – Amended September 2014.

228.   The General Release and Waiver was accompanied by the AT&T ADEA/OWBPA Notice and ADEA Listing.

229.   Per the ADEA Listing, the average age of those listed in the "Decisional Unit" (never properly identified or explained) was 34.31. The average age of the employees selected for surplus was 43.22.

230.    Per the ADEA Listing, the average age of those listed in the "Decisional Unit" who were assigned to an Affected Work Group (never properly identified or explained, but believed to reflect only those possibly impacted) was 40.32, as compared to an average age of 34.31 for the entire Decisional Unit.

231.    Plaintiff Sweeney was apparently assigned to AWG 1.  AT&T did not tell her the basis of her or others' assignment to AWG 1.

232.    Per the ADEA Listing, of the seven (7) individuals assigned to AWG 1, Plaintiff Sweeney was the only one selected for "surplus" by AT&T.  Of the remaining six individuals that AT&T did not select for "surplus," five were younger than Plaintiff Sweeney, including some who were substantially younger (including two individuals in their thirties).

233.    Based on, *inter alia,* her knowledge, skills, and outstanding track record with AT&T, and in particular as Director of Sales, Plaintiff Sweeney was at least as, or better, qualified for the Professional – Client Services Mgmt position than the five younger people in AWG 1 who were not selected for surplus.

234.    Per the ADEA Listing, of the four people who held the position of "National Indirect Director of Sales," only two were assigned to an AWG (Plaintiff Sweeney, to AWG 1, and a 46 year old to AWG 9), and Plaintiff Sweeney was the only one selected for "surplus."  The three individuals who held the National Indirect Director of Sales positions and who were not selected for surplus were younger than Plaintiff Sweeney, including a 42 year old.

235.    Based on, *inter alia,* her knowledge, skills, and outstanding track record with AT&T, including in particular as National Indirect Director of Sales, Plaintiff

Sweeney was at least as, or better, qualified than the three younger people who held that position and were not selected for surplus.

236.   Per the ADEA Listing, there were thirty-four (34) people who held Director of Sales positions in the Decisional Unit, only two of whom were selected for surplus (Plaintiff Sweeney and a 61 year old).  The average age of the thirty-four individuals who held Director of Sales positions in the Decisional Unit was 45.23; the average of those selected for surplus was 56.  Plaintiff Sweeney was older than twenty-seven (27) individuals who held a Director of Sales position in the Decisional Unit, including several individuals younger than forty (40), each of whom was not selected for surplus and was retained by AT&T.

237.   Based on, *inter alia,* her knowledge, skills, and outstanding track record with AT&T, including in particular as a Director of Sales, Plaintiff Sweeney was at least as, or better, qualified than the 27 younger people who held that position and were not selected for surplus.

238.   Based on, *inter alia*, her last formal performance appraisal in which Plaintiff Sweeney received an overall score of "Fully Meets," and a leadership rating of "Exceeds," and the recognition by AT&T of her outstanding performance, results, and positive contributions to the company over an 18 year career, any fair and unbiased assessment of criteria on which individuals were to have been rated and ranked for surplus selection purposes would have resulted in a top rating/ranking and not in selection for "surplus" status.

239.   On June 3, 2016, AT&T sent Plaintiff Sweeney an e-mail with a subject line reading "ADEA Listing for new Surplus Case – Applicable to Employees in Surplus

Cases 16-119, 16-120, 16-121, 16-125 and 16-126" with an attached "ADEA Listing."

AT&T never explained why this new ADEA Listing was "applicable" to Plaintiff

Sweeney's "business case" of 16-119.  AT&T never explained why her "business case"

was somehow connected to these other cases, nor why AT&T never provided Plaintiff

Sweeney with the OWBPA data for these other cases.  AT&T never stated whether the

"ADEA Listing for new Surplus Case" included the information pertinent to Plaintiff

Sweeney.  The "ADEA Listing for new Surplus Case" included individuals assigned to

"AWG 1."  AT&T never explained what this "AWG 1" included and whether it was the

same or at all connected to the "AWG 1" to which Plaintiff Sweeney had been assigned.

240.    Following Plaintiff's "surplus" notification, and notwithstanding her

outstanding credentials, experience and track record of success, no AT&T manager

sent Plaintiff Sweeney a CON advising her of open positions and seeking her

application.

241.    Following her "surplus" notification, Plaintiff applied for at least three open

and posted AT&T positions for which she was qualified.  AT&T did not even interview

her for any of the positions, and selected her for none.

242.    On July 22, 2016, AT&T terminated Plaintiff Sweeney's employment.

243.    AT&T had instructed Plaintiff Sweeney that in order to receive a payment

under the AT&T, Inc. Severance Pay Plan, she was then required to sign the General

Release and Waiver within 90 days after her termination.  However, AT&T provided to

Plaintiff Sweeney no additional or supplemental ADEA Listing beyond that provided on

June 3, 2016, and never told Plaintiff Sweeney the job titles and ages of those among

the "surplussed" employees who were actually terminated.

244.    Several younger individuals who were notified of "surplus" status at the same time as Plaintiff Sweeney, and believed to have been listed as having been "surplussed" and referenced by job title and age as having been selected on the ADEA Listing, secured alternative positions and were not actually terminated.

245.    Although the General Release and Waiver stated that it was a general release of all claims and waiver of all rights, including under the ADEA, AT&T knew that this was a false representation.  As set forth above in ¶¶ 81-88, the General Release and Waiver contained misstatements of fact, was misleading, was not knowing and voluntary, and failed to comply with the strict disclosure requirements of the OWBPA.  In addition to the common deficiencies identified above, the disclosures that AT&T did provide to Plaintiff Sweeney were even more confusing in light of its June 3, 2016 communication.

246.    Plaintiff Sweeney signed and returned to AT&T the General Release and Waiver on or about October 20, 2016.  However, the purported waiver of Plaintiff Sweeney's claims and right to bring and/or participate in a collective and/or representative action under the ADEA is invalid, unenforceable, and in violation of the OWBPA.

247.    AT&T retained at least five people younger than Plaintiff Sweeney who worked as a Director of Sales in the Liberty Market and reported to Ms. Cavalieri.

248.    Based on, *inter alia,* Plaintiff Sweeney's knowledge, skills, and outstanding track record with AT&T, including in particular her more than nine years as a Director of Sales and/or Sales Operations, Plaintiff Sweeney was better qualified than these younger individuals who were retained.  Without limitation:

    a.    Plaintiff Sweeney was the only Director with experience in Sales Operations, Company Owned Retail, and Indirect Retail.

    b.    AT&T retained Danny Perez (approximately 32), who had less than one year experience as a Director and had no college degree.

    c.    AT&T retained Giovanni Quiros (approximately 39), who had about two years or less experience as a Director and no college degree.

249.   Plaintiff Sweeney's performance did not warrant her selection for "surplus," the fact that she was not selected for open positions, or the termination of her employment.

250.   The reason that Plaintiff Sweeney was selected for "surplus," presented with a false and fraudulent release, not selected for available positions, and/or the termination of her employment was because of her age.

251.   Plaintiff Sweeney's age was a determinative factor in connection with AT&T's decisions to select her for "surplus," present her with a false and fraudulent release, not to select her for open positions, and/or to terminate her employment.

252   AT&T intentionally discriminated against Plaintiff Sweeney because of her age.

253.   Upon information and belief, AT&T's "2020" plan and/or its implementation by AT&T's three-step "surplus," then termination and fraudulent release scheme, collectively and/or individually, had a disparate impact on workers age 40 or over, including Plaintiff Sweeney.

254.   As a direct result of Defendant's discriminatory conduct, Plaintiff Sweeney has in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this

time.

### Plaintiff Katherine Seaman

255.   Plaintiff Seaman was hired by AT&T in or about August, 1986, and was employed by the company for more than 30 years before AT&T terminated her employment effective March 27, 2017 at the age of 49.

256.   From approximately September, 2004, until the time of her termination, Plaintiff Seaman worked as a Director in marketing.

257.   From January, 2015 through her termination, Plaintiff Seaman held the position of Director -- Marketing Management in AT&T's Entertainment Group.  Plaintiff Seaman reported to Annette Isom, AVP (approximate age 54).  In January, 2016, Plaintiff Seaman was assigned to Roger Hyde (approximate age 52), and then reassigned again in April, 2016 to report to Craig Shirk, VP – Direct and Database Marketing (approximate age 41).  Since June, 2016, Plaintiff Seaman reported directly to David Banks, Executive Director Marketing Management (approximate age 46), who reported to Mr. Shirk, who reported to Vincent Torres, VP Direct Marketing, Retention, Analytics and Insight (approximate age 42).

258.   At the time of her termination, Plaintiff Seaman worked for AT&T in its office in Bedminster, New Jersey.

259.   Plaintiff Seaman received a W-2 from AT&T Services, Inc.

260.   Plaintiff Seaman was a highly qualified and dedicated employee of AT&T for more than 30 years.

261.   Among other qualifications, Plaintiff Seaman has a B.S. in Marketing from Fairleigh Dickinson University and a Six Sigma Green Belt.

262.   Plaintiff Seaman was promoted several times throughout her more than thirty year career.

263.   Plaintiff Seaman's extensive knowledge, skills, experience and record of achievement as a successful marketing Director were recognized by AT&T.  Among other things, she received annual merit increases, performance-based bonuses, and stock options.  Throughout her career with AT&T, Plaintiff Seaman was awarded with performance based honors like the "Spirit of Communication" and "Circle of Excellence" awards – which were the highest levels of awards presented to an employee.  As a Director, she received such an award twice.  Every one of her annual performance reviews was Fully Meets or better.

264.   In her performance review for 2015, Plaintiff Seaman received an overall rating of "Exceeds."  In her last formal performance review, completed for the year 2016, Respondents assigned to Plaintiff Seaman an overall performance rating of "Fully Meets," a business results rating of "Fully Meets," and a leadership rating of "Fully Meets."   The review praised Plaintiff Seaman for, among other things, having "extensive experience," "a wide range of skills" and "tackl[ing] issues proactively to find opportunities for improvement."

265.   On or about October 28, 2016, by its standard Surplus Notification Letter (identified as GG-ATT-SML-1, August 2015), AT&T notified Plaintiff Seaman that the position that she currently held "will be eliminated ....due to a reduction in positions within your level and organization."  As a result, it said, she was being placed on "surplus status."

266.   AT&T's statement that Plaintiff Seaman's position was being eliminated

was false and a pretext for age discrimination.

267. AT&T Human Resources representative, Thomas Balle, told Plaintiff Seaman words to the effect that AT&T was "picking off the older employees and everyone knows it."

268. On that same date, October 28, 2016, AT&T presented to Plaintiff Seaman a "General Release and Waiver," which was an AT&T standard form document marked as "GR&W-AT&T-Non-CA-GG – Amended September 2014."

269. The General Release and Waiver was accompanied by the AT&T ADEA/OWBPA Notice and an ADEA listing.

270. Per the ADEA Listing, the average age of those included in the "Decisional Unit" (never properly identified or explained) was 43.08, but the average age of those selected for "surplus" was 49.57.

271. Plaintiff Seaman was apparently assigned to AWG 14 (never properly identified or explained, but believed to reflect only those possibly impacted). AT&T never told Plaintiff Seaman the basis of her or others' assignment to an AWG, or why she was the only one assigned to AWG 14.

272. Per the ADEA Listing, of the seven people who held the position of Director – Marketing Mgmt, Plaintiff Seaman was the only one selected for "surplus." Of the six individuals who held the Director – Marketing Mgmt position and were not selected for "surplus," four were younger than Plaintiff Seaman, including three who were substantially younger.

273. Based on, *inter alia,* Plaintiff Seaman's knowledge, skills, experience and outstanding track record with AT&T, including in particular as a Director in marketing,

Plaintiff Seaman was at least as, or better, qualified than the four younger people who held that position and were not selected for surplus.

274.    Per the ADEA Listing, there were thirty-four (34) people who held Director positions in the "Decisional Unit."  The average age of the Directors was 44.8, but the average age of the Directors selected for "surplus" was 57.

275.    AT&T did not select for surplus 21 Directors who were younger than Plaintiff Seaman, most of whom were substantially younger.

276.    Based on, *inter alia,* Plaintiff Seaman's knowledge, skills, experience, and outstanding track record with AT&T, including in particular as a Director of marketing, Plaintiff Seaman was at least as, or better, qualified than the 21 younger people who held that the Director position and were not selected for surplus.

277.    Further, and not reflected on the ADEA Listing, upon information and belief, in January, 2017, three individuals were promoted to become Directors in the Entertainment Group reporting to Mr. Torres:  Alison Hu (approximate age 30); Courtney Knapp (approximate age 32-38); and Grace Shin (approximate age 40).

278.    Following Plaintiff's "surplus" notification, and while still employed and seeking a position, Plaintiff Seaman was never informed of these Director positions into which Ms. Hu, Ms. Knapp, and Ms. Shin were promoted, and never had the opportunity to apply or compete for them.

279.    Following Plaintiff's "surplus" notification, and notwithstanding her outstanding credentials, experience and track record of success, no AT&T manager sent Plaintiff Seaman a CON advising her of open positions and seeking her application.

280.   Following her "surplus" notification, Plaintiff Seaman applied for at least 46 available AT&T positions for which she was qualified.

> (a)   The majority of the positions Plaintiff Seaman applied for were at a lower level than her current position.
>
> (b)   AT&T did not even interview Plaintiff Seaman for 45 of these positions, for which she was clearly well qualified.
>
> (c)   The hiring manager for the one position for which Plaintiff Seaman was interviewed told her that he wanted her in the position, but that "leadership" would not permit it.
>
> (d)   The posting of one position for which Plaintiff Seaman seemed uniquely well suited and for which she applied was abruptly "cancelled" without explanation and, upon information and belief, was then advertised externally.
>
> (e)   AT&T passed over Plaintiff Seaman for an available, same level position for which Plaintiff Seaman was particularly well suited and for which she was told that she interviewed "masterfully" in favor of someone who was promoted into the position (contrary to the requirements to fill the position as had been stated by HR).

281.   On March 27, 2017, AT&T terminated Plaintiff Seaman's employment.

282.   AT&T had instructed Plaintiff Seaman that in order to receive a payment under the AT&T, Inc. Severance Pay Plan, she was then required to sign the General Release and Waiver within 90 days after her termination.  However, AT&T provided to Plaintiff Seaman no additional or supplemental ADEA Listing beyond that provided on October 28, 2016, and never told Plaintiff Seaman the job titles and ages of those among the "surplussed" employees who were actually terminated.

283.   Although the General Release and Waiver stated that it was a general release of all claims and waiver of all rights, including under the ADEA, AT&T knew that this was a false representation.  As set forth above in ¶¶ 81-88, the General Release

and Waiver contained misstatements of fact, was misleading, was not knowing and voluntary, and failed to comply with the strict disclosure requirements of the OWBPA. In addition to the common deficiencies identified above, the disclosures that AT&T did provide to Plaintiff Seaman did not reflect that younger individuals had been moved into available positions within her reporting structure prior to Plaintiff's Seaman's termination, and did not reflect their job titles and ages.

284. Plaintiff Seaman signed and returned to AT&T the General Release and Waiver on or about April 19, 2017. However, the purported waiver of Plaintiff Seaman's claims and right to bring and/or participate in a collective and/or representative action under the ADEA is invalid, unenforceable, and in violation of the OWBPA.

285. Upon information and belief, AT&T retained at least six individuals who held the position of Director – Marketing Mgmt, including three who were substantially younger.

286. Based on, *inter alia,* Plaintiff Seaman's knowledge, skills, experience, and outstanding track record with AT&T, including in particular as a Director in marketing, Plaintiff Seaman was at least as, or better, qualified than that the three substantially younger individuals retained.

287. Further, upon information and belief, AT&T promoted three substantially younger individuals to become Directors in the Entertainment Group reporting to Mr. Torres (Ms. Hu, approximate age 30; Ms. Knapp, approximate age 32-38; and Ms. Shin, approximate age 40).

288. Based on, *inter alia,* Plaintiff Seaman's knowledge, skills, experience, and outstanding track record with AT&T, including in particular as a Director in marketing,

Plaintiff Seaman was at least as, or better, qualified than these three substantially younger individuals who were promoted.

289.   Plaintiff Seaman's performance did not warrant her selection for "surplus," the fact that she was not selected for open positions, or the termination of her employment.

290.   The reason that Plaintiff Seaman was selected for "surplus," presented with a false and fraudulent release, not selected for open positions, and/or the termination of her employment was because of her age.

291.   Plaintiff Seaman's age was a determinative factor in connection with AT&T's decisions to select her for "surplus," present her with a false and fraudulent release, not to select her for available positions, and/or to terminate her employment.

292.   AT&T intentionally discriminated against Plaintiff Seaman because of her age.

293.   Upon information and belief, AT&T's "2020" plan and/or its implementation by AT&T's three-step "surplus," then termination and fraudulent release scheme, collectively and/or individually, had a disparate impact on workers age 40 or over, including Plaintiff Seaman.

294.   As a direct result of Defendant's discriminatory conduct, Plaintiff Seaman has in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

**COUNT I**
**VIOLATION OF THE ADEA – DISPARATE TREATMENT**
**(by each Named Plaintiff individually**
**and on behalf of the similarly situated Older Workers)**

295.    Plaintiffs incorporate by reference paragraphs 1 through 294 of this Complaint as if fully set forth herein.

296.    AT&T engaged in a pattern and practice of discrimination in it intentionally discriminated against Plaintiffs because of their age.

297.    Defendants selected Plaintiffs for "surplus," failed to place them into available positions, terminated their employment, and presented them with fraudulent General Releases and Waivers because of their age.

298.    Plaintiffs' age was a determinative factor in connection with AT&T's decisions to select them for "surplus," not select them for available positions, present them with a false and fraudulent General Release and Waiver, and/or to terminate their employment.

299.    As a direct result of Defendant's discriminatory conduct, Plaintiffs have in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

300.    No workers age forty (40) or older who were terminated as part of AT&T's 2020 plan and implemented pursuant to its three-step "surplus," then termination and fraudulent release scheme since May 20, 2015 were given OWBPA-compliant releases; therefore, none released his or her claims under the ADEA, or waived his or her right to bring or participate in a collective or representative action under the ADEA.

301.    All former non-bargained employees of AT&T who since May 20, 2015, and when age 40 or older received from AT&T a "Surplus Notification Letter," were

terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG  - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing" are similarly situated to Named Plaintiffs, as that term is used in the ADEA and the portions of the FLSA incorporated by the ADEA.

302.    Defendants, AT&T, Inc., AT&T Corp., AT&T Services, Inc. and AT&T Mobility Services, LLC, by the discriminatory acts set forth herein, have violated the ADEA.

303.    Defendants' violations were intentional and willful under the circumstances and warrant the imposition of liquidated damages.

304.    As a direct and proximate result of Defendants' violation of the ADEA, Plaintiffs have sustained the injuries, damages, and losses set forth herein.

305.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

**COUNT II**
**VIOLATION OF THE ADEA – DISPARATE IMPACT**
**(by each Named Plaintiff individually**
**and on behalf of the similarly situated Older Workers)**

306.    Plaintiffs incorporate by reference paragraphs 1 through 305 of this Complaint as if fully set forth herein.

307. Defendants, AT&T, Inc., AT&T Corp., AT&T Services, Inc. and AT&T Mobility Services, LLC, utilized practices, policies, and procedures that have disparately impacted Named Plaintiffs and all former non-bargained employees of AT&T who since May 20, 2015, and when age 40 or older received from AT&T a "Surplus Notification Letter," were terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing."

308. AT&T's "2020" plan and/or its implementation by AT&T's three-step "surplus," then termination and fraudulent release scheme, collectively and/or individually, had a disparate impact on Plaintiffs.

309. As a direct result of Defendants' discriminatory conduct, Plaintiffs have in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

310. No workers age forty (40) or older who were terminated as part of AT&T's 2020 plan and implemented pursuant to its three-step "surplus," then termination and fraudulent release scheme since May 20, 2015 were given OWBPA-compliant releases; therefore, none released his or her claims under the ADEA, or waived his or her right to bring or participate in a collective or representative action under the ADEA.

311.    All former non-bargained employees of AT&T who since May 20, 2015, and when aged 40 or older received from AT&T a "Surplus Notification Letter," were terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG  - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing" are similarly situated to Named Plaintiffs, as that term is used in the ADEA and the portions of the FLSA incorporated by the ADEA.

312.    Defendants, AT&T, Inc., AT&T Corp., AT&T Services, Inc. and AT&T Mobility Services, LLC, by the discriminatory acts set forth herein, have violated the ADEA.

313.    As a direct and proximate result of Defendants' violation of the ADEA, Plaintiffs have sustained the injuries, damages, and losses set forth herein.

314.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

**COUNT III**
**VIOLATION OF THE OWBPA**
**(by each Named Plaintiff individually**
**and on behalf of the similarly situated Older Workers)**

315.    Plaintiffs incorporate herein by reference paragraphs 1 through 314 as though set forth in their entirety.

316.    Defendants, AT&T, Inc., AT&T Corp., AT&T Services, Inc. and AT&T
Mobility Services LLC, by the above described improper and discriminatory acts, have
violated the OWBPA.

317.    No workers age forty (40) or older who were terminated as part of AT&T's
2020 plan and implemented pursuant to its three-step "surplus," then termination and
fraudulent release scheme since May 20, 2015 were given OWBPA-compliant releases;
therefore, none released his or her claims under the ADEA, or waived his or her right to
bring or participate in a collective or representative action under the ADEA.

318.    All former non-bargained employees of AT&T who since May 20, 2015,
and when age 40 or older received from AT&T a "Surplus Notification Letter," were
terminated upon failing to secure an alternative position with AT&T following surplus
notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-
CA-GG  - Amended September 2014) which offered a severance payment under the
AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice
Under The OWBPA ("Amended September 2014") and an "ADEA Listing" are similarly
situated to Named Plaintiffs, as that term is used in the ADEA and the portions of the
FLSA incorporated by the ADEA.

319.    The General Release and Waiver given to Plaintiffs by Defendants did not
constitute a valid release of claims or rights under the ADEA.

320.    As a direct and proximate result of Defendants' violation of the OWBPA,
terminated workers over the age of forty (40) have been misled regarding their rights
under federal law and/or harmed in the prosecution of their claims under the ADEA.

321.    Individuals who signed the General Release and Waiver, including those among the Named Plaintiffs, did not release their ADEA claims nor did they waive their rights under the ADEA to bring or participate in a collective or representative action under the ADEA.

322.    In addition to all other damages, Plaintiffs are entitled to declaratory relief, declaring the General Releases and Waivers invalid as to all claims and rights under the ADEA.

323.    As a direct and proximate result of Defendants' violation of the OWBPA, Plaintiffs have sustained the injuries set forth herein.

324.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts unless and until this Court grants the equitable relief requested herein.

325.    Plaintiffs who were given the fraudulent and invalid General Release and Waivers are suffering and will continue to suffer unless and until this Court grants the relief requested herein.

## **RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Named Plaintiffs, Roy Horowitz, Linda Larson, Kempten Pollard, Kathleen Sweeney, and Katherine Seaman, and against Defendants, AT&T, Inc., AT&T Corp., AT&T Services, Inc., and AT&T Mobility Services, LLC:

a.      requiring Defendants to provide to the Named Plaintiffs the names, dates of birth, addresses (including e-mail addresses), telephone numbers, dates of

termination, and former titles of all former non-bargained employees of AT&T who since May 20, 2015, and when age 40 or older received from AT&T a "Surplus Notification Letter," were terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG  - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing";

b.      requiring that notice be given to all former non-bargained employees of AT&T who since May 20, 2015, and when age 40 or older received from AT&T a "Surplus Notification Letter," were terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG  - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing" that the General Release was in violation of the OWBPA and does not prohibit them from bringing age claims under the ADEA against Defendants, and that each such individual has the right to opt in to this litigation as a named Plaintiff without being required to tender back any consideration that they received from Defendants;

c.      declaring the General Release and Waiver agreements signed by Named Plaintiffs and Older Workers, as defined, to be in violation of the OWBPA and invalid as to claims and rights under the ADEA;

      d.      ordering that this action shall proceed as a collective action to include all former non-bargained employees of AT&T who since May 20, 2015, and when age 40 or older received from AT&T a "Surplus Notification Letter," were terminated upon failing to secure an alternative position with AT&T following surplus notification, were presented with a General Release and Waiver ("GR&W-AT&T-Non-CA-GG  - Amended September 2014) which offered a severance payment under the AT&T, Inc. Severance Pay Plan, and was accompanied by an ADEA Information Notice Under The OWBPA ("Amended September 2014") and an "ADEA Listing";

      e.      declaring the acts and practices complained of herein to be a violation of the ADEA;

      f.      declaring the acts and practices complained of herein to be a violation of the OWBPA;

      g.      enjoining and restraining permanently the violations alleged herein;

      h.      awarding compensatory damages to Plaintiffs to make Plaintiffs whole for all past and future lost earnings, benefits, and earnings capacity which Plaintiffs have suffered and will continue to suffer as a result of Defendants' discriminatory conduct;

      i.      awarding liquidated damages to Plaintiffs;

      j.      awarding Plaintiffs the costs of this action, together with reasonable attorney's fees;

      k.      awarding Plaintiffs such other damages as are appropriate under the ADEA, as amended by the OWBPA; and,

      l.      granting such other and further relief as this Court deems appropriate.

Date:  June 29, 2017                                    **CONSOLE MATTIACCI LAW, LLC**

                              BY:

Stephen G. Console
Laura C. Mattiacci
Susan M. Saint-Antoine
Emily R. Derstine-Friesen
110 Marter Avenue, Suite 502
Moorestown, NJ  08057
(856) 854-4000
(856) 854-4006 (fax)
console@consolelaw.com
mattiacci@consolelaw.com
santanto@consolelaw.com
derstinefriesen@consolelaw.com

Attorneys for Plaintiffs,
Roy Horowitz,
Linda Larson,
Kempten Pollard,
Kathleen Sweeney,
and Katherine Seaman
(*on behalf of themselves individually
and on behalf of those similarly situated*)