NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---
                    :

|  |  |
|---|---|
| ROY HOROWITZ, LINDA LARSON, KEMPTEN POLLARD, KATHERINE SEAMAN, and KATHLEEN SWEENEY, | : <br> : <br> : <br> : |
| Plaintiffs, | :      Civil Action No. 3:17-cv-4827-BRM-LHG <br> : |
| v. | : <br> :         **OPINION** |
| AT&T INC., AT&T CORP., AT&T SERVICES, INC., and AT&T MOBILITY SERVICES LLC, | : <br> : <br> : <br> : |
| Defendants. | : <br> : |

---

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are: (1) AT&T, Inc.'s ("INC")[1] Motion to Dismiss against Roy Horowitz ("Horowitz"), Linda Larson ("Larson"), Kempten Pollard ("Pollard"), Katherine Seaman ("Seaman"), and Kathleen Sweeney ("Sweeney," collectively "Plaintiffs") for lack of jurisdiction (ECF No. 21); (2) AT&T Services, Inc. ("SERVICES") and AT&T Mobility Services, LLC's ("MOBILITY") Motion to Dismiss Larson and Pollard's claims for lack of jurisdiction (ECF No. 23); and (3) AT&T Corp. ("CORP"), SERVICES, and MOBILITY'S Motion to Dismiss for failure to state a claim (ECF No. 22).[2] Plaintiffs oppose all motions. (ECF Nos. 41, 42, and 43.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on April 10, 2018. For the

---

[1] Although at Oral Argument the Court stated it would refer to AT&T Inc. as AT&T, it has decided to refer to it as INC because Plaintiffs Complaint does not distinguish among the AT&T Defendants and instead refers to all Defendants collectively as AT&T. As articulated below, Plaintiffs argue all entities are a single entity, joint employers, or alter egos of one another. As such, the Court will only distinguish between Defendants when applicable.

[2] INC, CORP, SERVICES, and MOBILITY will collectively be referred to as Defendants.

reasons set forth below, INC's Motion to Dismiss for lack of jurisdiction is **DENIED**; SERVICES and MOBILITY'S Motion to Dismiss Larson and Pollard's claims for lack of jurisdiction is **GRANTED**; and CORP, SERVICE, and MOBILITY'S Motion to Dismiss for failure to state a claim is **GRANTED in part and DENIED in part**.

## I. BACKGROUND

### A. Factual Background

For the purposes of the motions to dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997). This matter involves violations of the Age Discrimination in Employment Act ("ADEA") in which, it is alleged, Defendants engaged in a "company-wide plan" to replace the aging workforce in Defendants' corporations with a younger one by the year 2020 (the "2020 Scheme"), with a three-step "surplus" then termination and fraudulent release scheme. (*See* Compl. (ECF No. 1).)

#### 1. The Parties

Horowitz is a citizen of the state of New Jersey. (*Id.* ¶ 1.) He was hired by AT&T in December 1995, and was employed at the company for more than 20 years before his termination effective June 21, 2016, at the age of 56. (*Id.* ¶ 141.) At the time of his termination, he worked in the Bedminster, New Jersey office and received his W-2 from CORP. (*Id.* ¶¶ 143-44.) From approximately 2014 until the time of his termination, he served as the Professional - Client Services Project Manager and reported to Peter Marcinkowski ("Marcinkowski"), AT&T's Senior Program Project Manager. (*Id.* ¶ 142.)

Larson is a citizen of the state of Arizona. (*Id.* ¶ 3.) She was hired by AT&T in 1973, and was employed at the company for approximately 34 years before her termination effective March 7, 2016, at the age of 61. (*Id.* ¶ 100.) At the time of her termination, she worked "for AT&T from her home in Lake Havasu City, Arizona" and received her W-2 from SERVICES. (*Id.* ¶¶ 102-03.) From 2013 until the time of her termination, Larson served as the Manager of Sales Planning and reported to Glen Greenwell. (*Id.* ¶ 101.)

Pollard is a citizen of the state of Florida. (*Id.* ¶ 5.) He was hired by AT&T in May 2006, and was employed at the company for more than 10 years before his termination effective June 21, 2016, at the age of 69. (*Id.* ¶ 178.) At the time of his termination, Pollard worked for AT&T from his home in Bradenton, Florida and was assigned to an AT&T office in Tampa, Florida. (*Id.* ¶ 181.) He received his W-2 from SERVICES. (*Id.* ¶ 182.) From 2008 until the time of his termination, Pollard served as the Professional – Client Serves project Manager and reported to Marcinkowski. (*Id.* ¶ 179.)

Seaman is a citizen of the state of New Jersey. (*Id.* ¶ 7.) She was hired by AT&T in August 1986, and was employed at the company for more than 30 years before her termination effective March 27, 2017, at the age of 49. (*Id.* ¶ 255.) At the time of her termination, Seaman worked for AT&T in the Bedminster, New Jersey office and received her W-2 from SERVICES. (*Id.* ¶ 258-59.) From September 2004 until the time of her termination, she worked as a Director in marketing. (*Id.* ¶ 256.) Specifically, from January 2015 until her termination, she held the position of Director-Marketing Management in AT&T's Entertainment Group and initially reported to Annette Isom, then Roger Hyde, then Craig Shirk, and ultimately David Banks. (*Id.* ¶ 257.)

Sweeney is a citizen of New Jersey. (*Id.* ¶ 9.) She was hired by AT&T in November 1997, and was employed at the company for more than 18 years before her termination effective July 22,

2016, at the age of 51. (*Id.* ¶ 216.) At the time of her termination, Sweeney worked for AT&T in King of Prussia, Pennsylvania, but travelled for work to field offices in various states, including New Jersey, and occasionally worked from her home in New Jersey. (*Id.* ¶ 219.) She received her W-2 from MOBILITY. (*Id.* ¶ 220.) From 2007 until the time of her termination, Sweeney served as the Director of Sales (from January 2014 through April 2015, she held the position of Director of Sales Operations), and reported to Tiffany Baehman until 2016 and then Judy Cavalieri. (*Id.* ¶ 217.)

"[INC] is a Delaware corporation that is the parent company of several wholly-owned and controlled subsidiary corporations, including [SERVICES], MOBILITY, and [CORP]." (*Id.* ¶ 11.) It has its headquarters in Texas. (*Id.* at 1 (*see* caption).) CORP is a New York corporation with its principal place of business in Bedminster, New Jersey. (*Id.* ¶ 14.) CORP is duly registered to transact business in New Jersey, with a registered agent located in New Jersey for service of process. (*Id.*) SERVICES is a Delaware corporation. (*Id.* ¶ 15.) It is registered to transact business in New Jersey, with a registered agent located in New Jersey for service of process. (*Id.*) "It maintains several places of business located throughout the state of New Jersey, maintains systematic and continuous activity such that it is at home in New Jersey, and employs many people in the state of New Jersey." (*Id.*) MOBILITY is a Delaware limited liability corporation. (*Id.* ¶ 16.) It is duly registered to transact business in New Jersey, with a registered agent in New Jersey for service of process. (*Id.*) "It maintains several places of business located throughout the state of New Jersey, maintains systematic and continuous activity such that it is at home in New Jersey, and employs many people in the state of New Jersey." (*Id.*)

Plaintiffs contend Defendants share "common ownership, management, administrative services, personnel, policies and employment practices." (*Id.* ¶ 17.) Defendants hold themselves out to the public and their employees as a "family of companies" known as AT&T. (*Id.* ¶ 18.)

### 2. 2020 Scheme

Plaintiffs allege AT&T engaged in an intentional "pattern and practice of age discrimination adversely affecting [] Plaintiffs and similarly situated Older Workers." (*Id.* ¶ 39-40.) AT&T allegedly came up with a corporate-wide plan to replace its older workforce with a younger one by 2020. (*Id.* ¶ 44.)

AT&T's 2020 Scheme has allegedly been in effect since at least early 2013 and continues to this day. (*Id.* ¶ 53.) The 2020 Scheme operates in a three-step "surplus," then termination, and fraudulent release scheme. (*Id.* ¶ 54.) Through a standard form and AT&T Surplus Notification Letter, AT&T

> notifies certain employees that the company has been "evaluating certain business units within the AT&T family of companies. After a thorough and careful review, we have determined that the position which you currently hold will be eliminated. This is due to a reduction in positions within your level and organization. As a result of this decision, you will be placed on surplus status, effective the day following the date that appears at the top of this letter, and you may receive severance benefits if you meet the eligibility criteria."

(*Id.* ¶ 57.) Plaintiffs claim the decisions as to who will be placed on surplus status are subjective and based on age discriminatory bias. (*Id.* ¶ 58.)

Employees selected for surplus had the opportunity to apply for alternative positions in AT&T by the end of the surplus period. (*Id.* ¶ 67.) However, at the conclusion of the surplus period, if an employee placed on surplus did not find an alternative position, their employment was terminated. (*Id.*) Plaintiffs allege "[t]he application and selection for available position process is

infected with age bias." (*Id.* ¶ 68.) "During the 'surplus' period, many employees who were notified of 'surplus' status, including those under age 40, secured available positions." (*Id.* ¶ 77.)

After termination, the employees had an opportunity to receive a severance payment under the INC Severance Pay Plan if he or she executed the "GR&W-AT&T-Non-CA-GG-Amended September 2014" (the "General Release and Waiver"), which was presented to employees on the same day as the AT&T Surplus Notification Letter, as part of a standard uniform package. (*Id.* ¶¶ 62, 80.) "The General Release and Waiver purports to release all claims against AT&T with respect to the recipient's employment and termination of employment, and to waive the right to be in or participate in a class, collective, or representative action on claims arising prior to signing, including under the ADEA." (*Id.* ¶ 63.) The General Release and Waiver form was also accompanied by a standard form "stamped on the bottom as 'Amended September 2014' and entitled 'AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA) INFORMATION NOTICE UNDER THE OLDER WORKERS BENEFIT PROTECTION ACT" (the "OWBPA Notice"). (*Id.* ¶ 64.)

Plaintiffs argue the General Release and Waiver is invalid and unenforceable as to rights and claims under the ADEA, contains misstatements of facts, is misleading, was not knowingly and voluntarily signed, and failed to comply with the strict disclosure requirements of the OWBPA. (*Id.* ¶ 82.) The General Release and Waiver allegedly fails to comply with the OWBPA because, among other things, it does not contain information about the decisional unit involved, eligibility factors for participation in the INC Severance Pay Plan, time limits applicable to the INC Severance Pay Plan, the job titles and ages of the employees designated to participate in INC Severance Pay Plan, and job titles and ages of those who were not selected to participate in the INC Severance Pay Plan. (*Id.* ¶ 82(a).)

All Plaintiffs allege they received an AT&T Surplus Notification Letter, General Release and Waiver, and OWMPA Notice prior to their termination. (*Id.* ¶¶ 109, 115, 116, 151, 153, 154, 189, 191, 192, 225, 227, 228, 265, 268, 269.) Moreover, all Plaintiffs applied for at least two open and available positions with AT&T for which they were qualified, but were not interviewed or selected for any position. (*Id.* ¶¶ 126, 127, 163, 201, 241, 280.) All Plaintiffs but Larson signed the General Release and Waiver. (*Id.* ¶¶ 131, 167, 205, 246, 284.)

## B. Procedural Background

On June 29, 2017, Plaintiffs filed a Complaint against Defendants alleging: (1) a violation of the ADEA, based on disparate treatment; (2) a violation of the ADEA, based on disparate impact; and (3) a violation of the OWBPA. (*See* ECF No. 1.) On September 25, 2017, Defendants filed three motions: (1) INC filed a Motion to Dismiss for Lack of Jurisdiction; (2) SERVICES and MOBILITY filed a Motion to Dismiss for lack of jurisdiction as to Plaintiffs Larson and Pollard's claims; and (3) CORP, SERVICES, and MOBILITY filed a Motion to Dismiss for failure to state a claim. (ECF Nos. 21-23.) Plaintiffs oppose all motions. (*See* ECF Nos. 41-43.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing the court's jurisdiction over the defendant. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Although the plaintiff must ultimately prove personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the early stages of litigation. *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). Instead, the plaintiff must "present[ ] a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts

between the defendant and the forum state." *Id.* at 1223 (citations omitted). Because a Rule 12(b)(2) motion "is inherently a matter which requires resolution of factual issues outside the pleadings," the jurisdictional allegations may be supported with sworn affidavits or other documents. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). Once the plaintiff meets his or her burden, the burden shifts to the defendant to establish the presence of other considerations that would render the exercise of personal jurisdiction unreasonable. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (citation omitted).

### B. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is

liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While as a general rule, a court many not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir.1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

## III. DECISION

### A. Personal Jurisdiction Generally

"[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819

F.2d 434, 437 (3d Cir. 1987)). In New Jersey, "courts may exercise jurisdiction over a nonresident defendant to the uttermost limits permitted by the United States Constitution." *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d 575, 589 (2010), *rev'd on other grounds sub nom.*, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011). "Accordingly, in determining whether personal jurisdiction exists, we ask whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007).

Personal jurisdiction may be established through general jurisdiction or specific jurisdiction over a defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (noting that "opinions in the wake of the pathmarking *International Shoe* decision have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction"). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). With respect to a corporation, in *Daimler*, the Supreme Court emphasized that the general jurisdiction inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' [but] whether that corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'" *Id.* at 761 (quoting *Goodyear*, 564 U.S. at 919). The Supreme Court explained that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Id.* at 760. For a corporate defendant, "the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction." *Id.* (internal citation omitted).

*Daimler* also recognized the possibility that, in an "exceptional" case, "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n.19. However, an approach that "approve[s] the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Id.* at 761 (internal citation omitted). If general jurisdiction is established, a defendant can be sued in that jurisdiction on any matter. *Boswell v. Cable Servs. Co., Inc.*, No. 16-4498, 2017 WL 2815077, at *3 (D.N.J. June 29, 2017).

Specific jurisdiction may be established over a defendant where the defendant "has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citations omitted). More specifically, specific jurisdiction requires that: "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) the assertion of personal jurisdiction is reasonable and fair." *WAG Acquistion, LLC v. Multi-Media, LLC*, No. 14-1661, 2015 WL 5310203, at *12 (D.N.J. Sept. 10, 2015) (citation omitted); *Shuker v. Smith & Nephew, PLC*, No. 16-3785, 2018 WL 1096185, at *14 (3d Cir. Mar. 1, 2018) (stating "what is necessary [for specific jurisdiction] is a deliberate targeting of the forum") (citation omitted).

A court's exercise of personal jurisdiction "requires some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (emphasis added). Additionally, due process requires that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see also O'Connor*, 496 F.3d at 316 (discussing the three-step process in determining personal jurisdiction). Importantly, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being hauled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "[A] plaintiff's residence, by itself, is insufficient to establish personal jurisdiction" over a defendant. *Choi v. Damul Corp.*, No. 12-2440, 2014 WL 314669, at *7 (D.N.J. Jan. 27, 2014). "Once specific jurisdiction is established, a defendant can be sued in the jurisdiction only in the matter from which the jurisdiction arises." *Boswell*, 2017 WL 2815077, at *3.

### 1.      INC

INC argues the Court lacks personal jurisdiction over it because it is solely a holding company with no contacts in New Jersey. (ECF No. 21-1 at 3.) Specifically, it argues there is no general jurisdiction because its place of incorporation is Delaware, its principal place of business is located in Texas, and Plaintiffs do not allege exceptional circumstances to support the exercise of general jurisdiction over it. (*Id.* at 6.) In addition, INC argues its subsidiaries, CORP, SERVICES, and MOBILITY are not its alter ego. (*Id.* at 11-15.) Lastly, INC argues there is no basis for specific jurisdiction over it because it has no minimum contacts with New Jersey, has no employees or real estate in New Jersey, does not insure persons or property in New Jersey, is not registered to do business in New Jersey, and neither produces goods or services nor advertises in New Jersey. (*Id.* at 8.)

Plaintiffs contend this Court has general jurisdiction over INC because INC has vast contacts in New Jersey and is a single-employer or joint employer with CORP, SERVICES, and MOBILITY, and its subsidiaries are its alter ego. (*See* ECF No. 42.) In the alternative, Plaintiffs

argue this Court has specific jurisdiction over INC because it committed and/or directed the 2020 Scheme. (*Id.* at 8-22.)

The Court finds there is no basis for exercising general jurisdiction over INC. Indeed, Plaintiffs admit INC is a Delaware corporation with its principal place of business in Texas. (ECF No. 1 ¶ 11 and at 1 (the caption of the Complaint).) *Daimler*, 134 S. Ct. at 760 (stating "the place of incorporation and principal place of business are paradig[m]. . . bases for general jurisdiction"). Moreover, Plaintiffs do not otherwise allege any exceptional circumstances to support the exercise of general jurisdiction. *Id.* at 761 n.19 (recognizing the possibility that, in an "exceptional" case, "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State"). Plaintiffs do not allege that INC directly employed any individuals or directly maintained any business locations in New Jersey. Instead, it argues its subsidiaries hold principal places of business in New Jersey and employ people in New Jersey. (*Id.* ¶ 13.) Although Plaintiffs assert INC maintains systematic and continuous activity such that it is at home in New Jersey, this allegation is merely conclusory and unsupported by any factual allegations in the Complaint or affidavits.

The Court also finds there is no general jurisdiction based on a theory of "single employer," "joint employer," or alter ego of INC's subsidiaries CORP, SERVICES, and MOBILITY. First, "single employer" or "joint employer" theories "and similar concepts are relevant for determining liability, but are not for determining whether a court may exercise personal jurisdiction over a party." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d 277, 328 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012) ("The court is persuaded by the latter group of decisions in which the courts recognized that the joint employer theory and similar concepts are

relevant for determining liability, but are not for determining whether a court may exercise personal jurisdictional over a party."); *see Moreau v. Air France*, 356 F.3d 942, 944 (9th Cir. 2004) (stating joint employment does not determine personal jurisdiction); *Campanelli v. Image First Unif. Rental Serv., Inc.*, No. 15-04456, 2016 WL 4729173, at *7 (N.D. Cal. Sept. 12, 2016) ("[B]asing personal jurisdiction on joint employer status . . . appears to be the minority view. . . . Even if [defendant] were liable under a 'joint employer' theory, this does not establish that a separate, non-resident corporate entity without minimum contacts can be hailed into a California court."); *E.E.O.C. v. Bass Pro Outdoor World, LLC*, 884 F. Supp. 2d 499, 525–26 (S.D. Tex. 2012) ("The integrated enterprise theory . . . is a liability standard . . . not a jurisdictional standard."); *Heidbrink v. ThinkDirect Mktg. Grp., Inc.*, No. 14-1232, 2014 WL 3585698 at *4 (M.D. Fla. 2014) ("A joint employer theory is relevant to establish liability against a defendant under the FLSA; it is not relevant to establish specific jurisdiction."); *Vogt v. Greenmarine Holding, LLC*, No. 1-0311, 2002 WL 534542, at *3 (N.D. Ga. Feb. 20, 2002) ("Plaintiffs argue that the proper test for personal jurisdiction is whether OMC and Defendants constitute a 'single employer' so as to be liable under [a statute]. The court finds, however, that it is improper to conflate an issue of subject matter jurisdiction with personal jurisdiction. Liability and jurisdiction are two separate inquiries.").

Second, Plaintiffs allege this Court has general jurisdiction over INC based on the fact that CORP, SERVICES, and MOBILITY, which are subsidiaries of INC, are subject to the general jurisdiction of this Court and are alter egos of INC Courts in this District have applied the alter ego theory to cases of general jurisdiction. *See Mark IV Transp. & Logistics v. Lightning Logistics, Inc.*, 705 F. App'x 103, 107 (3d Cir. 2017); *Bootay v. KBR, Inc.*, 437 F. App'x 140, 143 (3d Cir. 2011); *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 609 (D.N.J. 2004). As such, the Court will apply the alter ego test in this matter.

"Whether the exercise of jurisdiction over a parent corporation is proper under the alter-ego theory depends upon the details of the unique relationship between the parent corporation and its subsidiary. The parent-subsidiary relationship itself is not sufficient to establish *in personam* jurisdiction over the parent entity." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d at 317-18 (citation omitted); *see also Lucas v. Gulf & W. Indus., Inc.*, 666 F.2d 800, 805-06 (3d Cir. 1981) (remarking on factors relevant for jurisdictional analysis between a parent and a subsidiary), *abrogated on other grounds*, *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046 (3d Cir. 1993); *Carfagno v. Ace, Ltd.*, No. 04-6184, 2005 WL 1523530, at *6 (D.N.J. June 28, 2005) (same). In New Jersey, a subsidiary will be deemed to be the alter ego or "mere instrumentality" of its parent if "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983) (citations omitted). "It is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil." *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988).

Courts consider factors such as: "(1) the level of capitalization of the subsidiary; (2) who the subsidiary does business with other than the parent; (3) the day-to-day involvement of the parent's directors, officers and personnel with the subsidiary; and (4) the payment of the subsidiary's salaries and expenses by the parent." *Seltzer*, 339 F. Supp. 2d at 610; *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 513 (D.N.J. 2008) (citations omitted) (listing the factors to consider as: "(1) whether the subsidiary is doing business in the forum that would otherwise be performed by the parent; (2) whether there is common ownership of the parent and a subsidiary; (3) whether there is financial dependency; and (4) whether the parent interferes with the

subsidiary's personnel, disregards the corporate formalities, and/or controls the subsidiary's marketing and operational policies."). Liability generally requires that the parent corporation "abused the privilege of incorporation by using the subsidiary to perpetuate a fraud or injustice, or otherwise to circumvent the law." *Patent Incentives, Inc. v. Seiko Epson Corp.*, No. 88-1407, 1988 WL 92460, at *6 (D.N.J. Sept. 6, 1988), *aff'd*, 878 F.2d 1446 (Fed. Cir. 1989) (citing *Ventron*, 468 A.2d at 164).

A parent company's domination or control of its subsidiary cannot be established by overlapping boards of directors. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("It is a well-established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."); *Leo v. Kerr-McGee*, No. 93-1107, 1996 WL 254054, at *6 (D.N.J. May 10, 1996) ("A significant degree of overlap between directors and officers of a parent and its subsidiary does not establish an alter ego relationship."). There is a general presumption "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," so dual office holding alone in not sufficient to establish liability. *Bestfoods*, 524 U.S. at 69 (citation omitted).

The  record does not support a finding that INC dominates over its subsidiaries in such a manner that the subsidiaries are mere conduits of INC. INC is purely a holding company, that conducts no business with the public; has no employees in New Jersey; no office or mailing address in New Jersey; does not own, lease, manage, or maintain any real property in New Jersey; is not an insurance company; does not pay income, property or franchise taxes to the state of New Jersey; does not engage in any advertising in New Jersey; and does not provide or place in the stream of commerce in New Jersey any product. (*See* ECF No. 21-2.) As other courts have stated,, a "holding

company could simply hold another type of subsidiary." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d at 324 (quoting *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2011)). Indeed, at least one other court in this circuit, when analyzing multiple factors in a similar situation involving a holding company, has concluded that in "an ordinary holding company/subsidiary relationship, not one of undue domination and control," there is no alter ego relationship. *Arch v. Am. Tobacco Co.*, 984 F. Supp. 830, 837-38 (E.D. Pa. 1997). Plaintiffs have failed to plead: (1) financial dependency of either subsidiary on INC; (2) undercapitalization of any of INC's subsidiaries; (3) INC paying the salaries and expenses of any INC subsidiary; (4) INC controlling the subsidiary's marketing and operational policies; (5) facts demonstrating the entities share the same day-to-day operations; (6) share similar employees; or (7) evidence of INC's every day involvement and control over any of its subsidiaries.

Instead, Plaintiffs rely on the fact that INC and its subsidiaries share the AT&T website, which has no separate pages or links devoted to any particular subsidiary; that INC and its subsidiaries all use @att.com email addresses; that INC and its subsidiaries share employment policies and codes of ethics; and that INC and its subsidiaries portray themselves as a single brand and to the public as the "AT&T family of companies." (ECF No. 42 at 9.) However, courts have found that "common marketing image and joint use of trademark logs fail to render [entities as] alter ego[s]." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d at 323; *see Prescott v. LivaNova PLC*, No. 16-00472, 2017 U.S. Dist. LEXIS 95830, at *25-26 (S.D. Iowa June 12, 2017) (granting a motion to dismiss where "[t]he companies share a common branding scheme, including a common email domain, but maintain completely separate day-to-day operations, employees, officers, and corporate structures"); *Gloria D. Wiseman v. ING Grp.,*

*N.V. et al.*, No. 16-07587, 2017 WL 4712417, at *13 (S.D.N.Y. Sept. 28, 2017) (finding that "the fact that ReliaStar personnel used voya.com email addresses or mention ReliaStar's relationship to Voya is no more than a different form of the argument that the two identified under the same brand, which courts have found insufficient as a matter of law to establish alter egos"); *Patterson v. Home Depot, USA, Inc.*, 684 F. Supp. 2d 1170, 1179 (D. Ariz. 2010) (holding that "[t]he fact the two companies used the same logo and intellectual property pursuant to the licensing agreement [] does not demonstrate that Krause-Werk was the alter ego of the other"); *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1301 (S.D. Cal. 2003) (holding that common trade name and logo, without more, is not a sufficient basis for establishing personal jurisdiction) (internal citations omitted). Moreover, a company being "portrayed as a single brand to the public . . . does not demonstrate the necessary control by defendant parent over the subsidiaries." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d at 323.

Accepting Plaintiffs' position would extend the alter ego doctrine, such that entities utilizing the same brand, website, and policies would be imputed as alter egos, without demonstrating the subsidiaries ignored corporate formalities in day-to-day activities, the subsidiaries financially relied on INC, INC's subsidiaries were undercapitalized, INC paid the salaries and expenses of any INC subsidiary, and the entities shared similar employees. Accordingly, the Court finds CORP, SERVICES, and MOBILITY are not alter egos of INC. As such, the Court lacks general jurisdiction over INC.

Third, Plaintiffs argue this Court has specific jurisdiction over INC because it initiated, directed, and benefited from the 2020 Scheme. (ECF No. 42 at 14-26.) The Court finds Plaintiffs have plead sufficient facts and submitted adequate evidence to establish specific jurisdiction as to INC at this stage of the litigation. "In ruling upon a motion to dismiss, courts must accept the

plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Machulsky v. Hall*, 210 F. Supp. 2d 531, 537 (D.N.J. 2002) (citing *Carteret Sav. Bank, F.A.*, 954 F.2d at 142 n.1).

As stated above, specific jurisdiction requires t: "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) the assertion of personal jurisdiction is reasonable and fair." *WAG Acquistion, LLC*, 2015 WL 5310203, at *12 (citation omitted). The General Release and Waiver directed at Plaintiffs, some of which are New Jersey residents (Larson, Sweeney, Seaman), offered an "[]INC Severance Pay Plan" if the terminated employees signed the release. (ECF No. 16-6 at 8.) After termination, the employees had an opportunity to receive a severance payment under the INC Severance Pay Plan if he or she executed the General Release and Waiver, which was presented to employees on the same day as the AT&T Surplus Notification Letter, as part of a standard uniform package. (ECF No. 1 ¶¶ 62, 80.) In fact, the INC Severance Pay Plan is listed in INC's Form 5500, Annual Return/Report of Employee Benefit Plan. (ECF No. 42-12 at 21-26.) As such, Plaintiffs have established INC purposefully directed activities (the 2020 Scheme) at New Jersey residents and the claims in this matter clearly arise out of the 2020 Scheme, which included the INC Severance Pay Plan. Moreover, personal jurisdiction is reasonable and fair because INC should have anticipate being hauled into court due to its Severance Pay Plan. *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

INC argues that it does not have any of the minimum contacts with New Jersey necessary for specific jurisdiction because

> [INC] is a Delaware corporation with its principal place of business in Dallas, Texas. It is and has always been a holding company. It has no employees or real estate in New Jersey. It does not insure persons

19

> or property in New Jersey. It does not pay taxes in New Jersey. [INC] is not registered to do business in New Jersey and it neither produces goods or services nor advertises in New Jersey. Simply put, [INC] has no presence, operations, or contracts in this form.

(ECF No. 21-1 at 8.) However, this argument ignores the fact that INC purposefully directed its 2020 Scheme, Severance Pay Plan at residents of New Jersey and the claims in this matter arises out of those activities. As such, the Court finds at this time Plaintiffs have demonstrated specific jurisdiction over INC. Accordingly, INC's Motion to Dismiss based on lack of personal jurisdiction is **DENIED**.

Lastly, INC argues Plaintiffs did not properly serve INC with the Complaint. (ECF No. 21-1 at 15-16.) Plaintiffs argue they properly served INC, and that assuming service was improper they timely addressed any defect. (ECF No. 42 at 29-30.) Because the ADEA "does not provide a means for service of process, a federal court may exercise personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Bane v. Netlink, Inc.*, 925 F.2d 637, 639 (3d Cir. 1991); *Swaim v. Moltan Co.*, 73 F.3d 711, 719 (7th Cir. 1996) ("The [ADEA] does not provide for nationwide service of process, and one must therefore resort to [state] law for service of process.").

Under New Jersey law, personal service is the primary method of effecting service. *See* N.J. Ct. R. 4:4–4(a), 4:4–5(a). New Jersey Court Rules 4:4–3 and 4:4–4(a) prescribe the methods of effecting personal service within the state. Substitute or constructive service, however, is permitted when personal service within the state cannot be effected. *See* N.J. Ct. R. 4:4–4(b), 4:4–5. For *in personam* jurisdiction, New Jersey Court Rule 4:4–4(b) provides the methods of substitute or constructive service, such as personal service outside the state, simultaneous mailings by ordinary and certified (or registered) mail, and "as provided by court order, consistent with due

process of law." N.J. Ct. R. 4:4–4(b)(1), (b)(3). For *in rem* and *quasi in rem* jurisdiction, New Jersey Court Rule 4:4–5 provides the methods for personal, substitute, and constructive service, such as service by publication. Regardless of the type of action, substitute or constructive service requires a demonstration of due diligence that satisfies the requirements specified in New Jersey Court Rule 4:4–5(b). *See* N.J. Ct. R. 4:4–5(a); 4:4–4(b)(1) (cross-referencing Rule 4:4–5(b)); N.J. Ct. R. 4:4(b)(3) (noting that service by a court order consistent with due process is precluded "[i]f service can be made by any of the modes provided by this rule"). As such, service of process outside the State requires an "affidavit satisfying the requirements of R. 4:4-5(b) that despite diligent effort and inquiry personal service cannot be made in accordance with paragraph (a) of this rule." N.J. Ct. R. 4:4–4(b).

On July 25, 2017, Plaintiffs served a Summons and Complaint on INC in Delaware. (ECF No. 4 and 11) Initially, Plaintiffs failed to attach an affidavit as required pursuant to New Jersey Court Rule 4:4–4(b). However, such defect has been timely addressed and cured on September 27, 2017. (Aff. of Inquiry (ECF No. 27)); *see* Fed. R. Civ. P. 4(m) (stating a defendant must be served within 90 days after the complaint is filed). As such, INC's Motion to Dismiss on this basis is **DENIED**.

### 2. Larson and Pollard's Claims Against SERVICES and MOBILITY

SERVICES and MOBILITY argue Larson and Pollard's claims against them should be dismissed for lack of personal jurisdiction. (*See* ECF No. 23.) Plaintiffs contend this Court has jurisdiction over Larson and Pollard's claims against SERVICES and MOBILITY because: (1) SERVICES and MOBILITY consented to general jurisdiction in New Jersey; (2) SERVICES and MOBILITY purposefully directed their 2020 Scheme at New Jersey; and (3) SERVICES and MOBILITY are part of the "AT&T family of companies," such that they are alter egos of INC and

all AT&T entities are a single employer, and the "AT&T family of companies" purposefully directed their 2020 Scheme at New Jersey. (*See* ECF No. 43.) The Court will address these arguments in turn.

Plaintiffs claim the Court has general jurisdiction over SERVICES and MOBILITY by virtue of them having registered to do business in New Jersey and having registered agents in the state of New Jersey. (ECF No. 43 at 5-8.) This District is split on the issue of whether the mere fact that a corporation is registered to do business in New Jersey and appointed an agent to receive process subjects it to general jurisdiction in New Jersey.

In *Otsuka Pharm. Co. v. Mylan Inc.*, Chief Judge Jerome B. Simandle addressed the issue of whether a corporation's registration to do business and appointment of a registered agent for service of process in New Jersey subjects the corporation to personal jurisdiction in New Jersey. 106 F. Supp. 3d 456, 467 (D.N.J. 2015). In relying on two Supreme Court cases from the first half of the twentieth century, prior to *Daimler*, Chief Judge Simandle concluded "a corporation's appointment of an agent for service of process constitutes, under certain circumstances, consent to the forum's personal jurisdiction." *Id.* (citing *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165 (1939); *Pa. Fire Ins. Co. of Phila. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95 (1917)). He reasoned that "in appointing an agent, a foreign corporation 'takes the risk of the construction that will be put upon the [registration] statute and the scope of the agency by the State Court.'" *Id.* at 468 (quoting *Robert Mitchell Furniture Co. v. Selden Breck Const. Co.*, 257 U.S. 213, 216 (1921)).

Chief Judge Simandle also relied on a decision from the Third Circuit, *Bane v. Netlink, Inc.*, where the Court found that "by registering to do business in Pennsylvania, the defendant purposefully availed itself of the privilege of conducting activities within the forum State, th[u]s

invoking the benefits and protections of its laws." *Otsuka Pharm.*, 106 F.3d at 468 (quoting *Bane v. Netlink, Inc.*, 925 F.2d 637, 640 (3d Cir. 1991)). Chief Judge Simandle concluded that the Supreme Court's decision in *Daimler* did not preclude jurisdiction through a corporation's consent by means of registration and appointment of an agent for service of process. *Id.* Chief Judge Simandle reasoned that *Daimler* concerned non-consensual general jurisdiction over a corporation but did not "cast any doubt on the continued vitality of consent-based jurisdiction." *Id.* Therefore, he found that two of the defendant corporations in that matter consented to jurisdiction in New Jersey by means of registering to do business and appointing a registered agent. *Id.* at 470; *see also Senju Pharm. Co. v. Metrics, Inc.*, 96 F. Supp. 3d 428, 438 (D.N.J. 2015) (another opinion by Chief Judge Simandle finding that "acceptance of service by a defendant registered to do business in the state establishes personal jurisdiction"); *Sadler v. Hallsmith SYSCO Food Servs.*, No. 08-4423, 2009 WL 1096309, at *2 (D.N.J. Apr. 21, 2009) ("Because the Court finds that [the defendant corporation] consented to being sued in the courts of New Jersey, the Court need not engage in an analysis of [the defendant corporation's] contacts with the state.").

However, in another decision from this District, Judge Madeline Cox Arleo reached the opposite conclusion. In *Display Works, LLC v. Bartley*, she found that a corporation did not consent to jurisdiction in New Jersey merely by registering to do business there and appointing an agent for service of process. 182 F. Supp. 3d 166, 179 (D.N.J. 2016). Judge Arleo had two primary reasons to support her conclusion. First, she distinguished the Third Circuit's decision in *Bane*. Judge Arleo notes, in *Bane*, the Third Circuit was interpreting Pennsylvania's registration statute, which provided that by registering to do business in Pennsylvania and designating an agent for service of process, a corporation consents to personal jurisdiction there. *Id.* at 173-75. Unlike the Pennsylvania registration statute, the New Jersey statute does not expressly state that a corporation

consents to jurisdiction when it registers to do business in New Jersey and appoints an agent for service of process. *Id.* at 174-75. Therefore, Judge Arleo concluded that "*Bane* compels the Court to find that the New Jersey statutory scheme does not permit [general] jurisdiction by consent by virtue of registration to do business here or actually doing business here." *Id.* at 175.

Second, Judge Arleo found that the early Supreme Court decisions relied upon by the court in *Otsuka Pharmaceutical* "developed from an outmoded way of thinking about jurisdiction" and were inconsistent with the Supreme Court's recent decision in *Daimler*. *Id.* at 176-77. Judge Arleo reasoned that

> [t]he sweeping interpretation that a state court gave to a routine registration statute and an accompanying power of attorney that *Pennsylvania Fire* credited as a general consent has yielded to the doctrinal refinement reflected in *Goodyear* and *Daimler* and the Court's 21st century approach to general and specific jurisdiction in light of expectations created by the continuing expansion of interstate and global business.

*Id.* at 178 (quoting *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 639 (2d Cir. 2016)). Therefore, Judge Arleo concluded that a corporation's registration to do business in New Jersey and appointment of an agent for service of process in New Jersey does not subject the corporation to general personal jurisdiction in New Jersey. *Id.* at 179; *see Boswell*, 2017 WL 2815077, at *6 (concluding the defendant's registration to do business in New Jersey did "not mean it consented to general jurisdiction in New Jersey"); *Kubin v. Orange Lake Country Club, Inc.*, No. 10-1643, 2010 WL 3981908, at *3 (D.N.J. Oct. 8, 2010) ("Filing a certificate to do business in New Jersey [is] insufficient to establish general jurisdiction, absent evidence that [defendant] was actually doing business in New Jersey."); *Smith v. S & S Dundalk Eng'g Works, Ltd.*, 139 F. Supp. 2d 610, 620 (D.N.J. 2001) (same); *Atkinson & Mullen Travel, Inc. v. New York Apple Tours Inc.*, 48 U.S.P.Q.2d 1377, 1379 (D.N.J. 1998) (having a license to conduct business in New Jersey is not

"in and of itself sufficient to establish continuous and substantial contacts"); *Wenche Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183 (5th Cir. 1992) (qualification to do business in a state is "of no special weight" in evaluating general jurisdiction), *cert. denied*, 506 U.S. 1080 (1993); *Dutch Run-Mays Draft, LLC v. Wolf Block, LLP*, 164 A.3d 435, 444 (N.J. Super. Ct. App. Div. 2017) ("We cannot agree business registration rises to consent to submit to the general jurisdiction in the forum.").

The Court finds Judge Arleo's reasoning in *Display Works* persuasive. The Court agrees that *Bane* is distinguishable due to the differences in the Pennsylvania and New Jersey corporation registration statutes. Notably, the New Jersey Statute does not contain any express language to put a corporation on notice that by registering to do business in New Jersey, it is also consenting to personal jurisdiction in the state. *See* N.J.S.A. 14A:1-1 et seq.; *World-Wide Volkswagen*, 444 U.S. at 291 ("Due process requires that the defendant be given adequate notice of the suit and be subject to the personal jurisdiction of the court." (internal citation omitted)). Furthermore, the Court finds that consent by registration is inconsistent with *Daimler*. *Daimler* reiterated the principal from *Goodyear* that there is general jurisdiction over a corporation in its place of incorporation and its principal place of business. *Daimler*, 134 S. Ct. at 760. *Daimler* also advised that older decisions addressing general jurisdiction over a corporation should be afforded little weight. *Id.* at 761 n.18 (stating that cases "decided in the era dominated by *Pennoyer's* territorial thinking should not attract heavy reliance today" (citation omitted)). Accordingly, the Court finds SERVICES and MOBILITY did not consent to personal jurisdiction by mere registration and appointment of an agent for service of process in the state of New Jersey.

Because registration and appointment of an agent for service of process in the state of New Jersey does not provide for general jurisdiction, the question remains whether there is another basis

for general jurisdiction as to SERVICES and MOBILITY. As previously stated, for a corporate defendant, "the place of incorporation and principal place of business are paradig[m]. . . bases for general jurisdiction." *Daimler*, 134 S. Ct. at 760 (internal citation omitted). *Daimler* also recognized the possibility that, in an "exceptional" case, "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n.19. However, an approach that "approve[s] the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Id.* at 761 (internal citation omitted).

Plaintiffs admit SERVICES and MOBILITY are Delaware corporations. (*Id.* ¶ 16.) Moreover, Plaintiffs acknowledge in the caption of the Complaint that SERVICES is headquartered in Texas and MOBILITY is headquartered in Georgia. (*See* ECF No. 1.) Plaintiffs do not allege in the Complaint that New Jersey is the principal place of business of SERVICES or MOBILITY. Instead, they contend SERVICES and MOBILITY maintain "several places of business located throughout the state of New Jersey, maintains systematic and continuous activity such that it is at home in New Jersey, and employs many people in the state of New Jersey." (*Id.* ¶¶ 15-16.) However, this is not sufficient. Only in an "exceptional" case can "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 134 S. Ct. at 761 n.19. In *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1777-78 (2017), the Supreme Court found the California court lacked personal jurisdiction over a pharmaceutical company that engaged in business in California, maintained five research and laboratories in California, and employed hundreds of employees in

California, and maintained a small state-government advocacy office in California. Accordingly, the Court finds SERVICES and MOBILITY are not subject to general jurisdiction in New Jersey.

The Court also finds SERVICES and MOBILITY are not subject to jurisdiction in New Jersey as to Larson and Pollard's claims under the theories of single employer or alter ego. First,, "single employer" or "joint employer" theories "and similar concepts are relevant for determining liability, but are not for determining whether a court may exercise personal jurisdiction over a party." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d at 328. Furthermore, as determined above, INC is not the alter ego of its subsidiaries. Thus, the fact that the Court found it has jurisdiction over INC is irrelevant and does not implicate jurisdiction over SERVICES or MOBILITY.

Moreover, to the extent Plaintiffs argue SERVICES and MOBILITY are alter egos of CORP or vice versa and therefore subject to personal jurisdiction, SERVICES and MOBILITY are not alter egos of CORP, a New York corporation with its principal place of business in Bedminster, New Jersey. (ECF No. 1 ¶ 14.) The record does not support a finding that SERVICES or MOBILITY dominate over CORP or vice versa, in such a manner that CORP is a mere conduit of SERVICES or MOBILITY. There is no evidence in the record of CORP's: (1) financial dependency of either SERVICES or MOBILITY; (2) undercapitalization of CORP; (3) SERVICES or MOBILITY paying the salaries and expenses of CORP; (4) SERVICES or MOBILITY controlling CORP'S marketing and operational policies; (5) evidence demonstrating the entities share the same day-to-day operations; (6) share similar employees; or (7) evidence of SERVICES or MOBILITY every day involvement and control over CORP. The fact CORP, SERVICES, and MOBILITY, use the same brand "AT&T"; the AT&T website has no separate pages or links devoted to any particular subsidiary; all entities use @att.com email addresses;

CORP, SERVICES, and MOBILITY share employment policies and codes of ethics; and that CORP, SERVICES, and MOBILITY portray themselves as a single brand and to the public as the "AT&T family of companies," is not enough. (ECF No. 43 at 11-18, 23-24.) Courts have found that common marketing image, common branding, common email domain, and joint use of trademark logs, fail to render entities as alter egos if they maintain completely separate day-to-day activities. *See In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d at 323; *see Prescott*, 2017 U.S. Dist. LEXIS 95830, at *25-26; *Gloria D. Wiseman*, 2017 WL 4712417, at *13; *Patterson*, 684 F. Supp. 2d at 1179; *Von Grabe*, 312 F. Supp. 2d at 1301. Thus, the fact the Court has jurisdiction over CORP is irrelevant and does not implicate jurisdiction over SERVICES or MOBILITY.

Lastly, the Court finds SERVICES and MOBILITY are not subject to specific jurisdiction in New Jersey over Larson or Pollard's claims. SERVICES and MOBILITY move to dismiss Larson and Pollard's claims, arguing that *Bristol-Myers* bars their claims. (ECF No. 8-12.) Specifically, SERVICES and MOBILITY argue that even though they have contacts in New Jersey (business locations and employees in New Jersey), their contacts do not relate to Larson or Pollard and do not arise out of those contacts because neither Larson nor Pollard worked in New Jersey. (*Id.*) They further argue Larson and Pollard cannot "piggy-back" on the claims and jurisdiction of the other named plaintiffs where the Court has specific jurisdiction over their claims as to SERVICES and MOBILITY. (*Id.* at 10.)

Plaintiffs claim there is specific jurisdiction over SERVICES and MOBILITY because they have direct contacts with New Jersey and because they purposefully directed activities at New Jersey residents. (ECF No. 43 at 18-22.) Plaintiffs further argue that *Bristol-Myers* does not apply to bar Larson and Pollard's claims because *Bristol-Myers* concerned a mass action asserting state

claims in state court and is therefore inapposite to the federal class action claims asserted here. (ECF No. 43 at 25-26.)

Specific jurisdiction requires that: "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) the assertion of personal jurisdiction is reasonable and fair." *WAG Acquistion, LLC*, 2015 WL 5310203, at *12 (citation omitted).

*Bristol–Myers* involved a Fourteenth Amendment due-process challenge to claims asserted by non-Californian plaintiffs in a mass civil action filed against Bristol–Myers in a California state court for injuries allegedly caused by a drug called Plavix. *Bristol–Myers*, 137 S. Ct. at 1777–79, 1787, 1789. Bristol–Myers, a citizen of Delaware and New York, challenged the California Supreme Court's application of a "sliding scale approach to specific jurisdiction," under which it held that although general jurisdiction was lacking in California because Bristol–Myers did not: (1) develop Plavix in California, (2) create a marketing strategy for Plavix in California, (3) manufacture, label, or package Plavix in California, or (4) work on the regulatory approval of Plavix in California; and the nonresident plaintiffs did not allege that: (1) they obtained Plavix through California physicians or other California sources, (2) were injured by Plavix in California, or (3) were treated for their injuries in California, the California state court nevertheless had personal jurisdiction over Bristol–Myers as to the claims of the nonresident plaintiffs as well as the resident plaintiffs. *Id.* at 1778–79. The California court reasoned that because Bristol–Myers had "extensive contacts with California" it permitted the exercise of specific jurisdiction "based on a less direct connection between [Bristol–Myers's] forum activities and plaintiffs' claims than might otherwise be required." *Id.* at 1778–79 (quoting *Bristol–Myers*, 377 P.3d at 887–89).

On appeal, the United States Supreme Court found the California rational amounted to a "loose and spurious form of general jurisdiction" and held that, because the California approach had allowed for claims to proceed against Bristol–Myers despite the lack of a connection between the forum and the specific claims at issue, the approach did not comport with "settled principles of personal jurisdiction" and exceeded due process limits. *Bristol–Myers*, 137 S. Ct. at 1781–83. However, the Supreme Court limited its decision; because "[its] decision concern[ed] the due process limits on the exercise of specific jurisdiction by a State, [it] le[ft] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1783–84 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987)).

Courts have found *Bristol–Myers* also resolved the question of whether, absent a connection between a state and the specific claims brought by a nonresident named class action plaintiff against a defendant not subject to general jurisdiction in that state, a court may nonetheless exercise specific jurisdiction over those claims because they are similar or identical to claims brought in the same case by a resident named plaintiff against the same defendant. First, while *Bristol–Myers* addressed state law claims, courts have found that nothing in *Bristol–Myers* suggests that it does not apply to named plaintiffs in a federal putative class action. *See In re Dental Supplies Antitrust Litig.*, No. 16-696, 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017) ("The constitutional requirements of due process do[] not wax and wane when the complaint is individual or on behalf of a class. Personal jurisdiction in class actions must comport with due process just the same as any other case."); *Greene v. Mizuho Bank, Ltd.*, No. 14-1437, 2017 WL 7410565, at *4 (N.D. Ill. Dec. 11, 2017) ("Nothing in *Bristol-Myers* suggests that it does not apply to named plaintiffs in a putative class action; rather, the Court announced a general principal—that due

process requires a connection between the forum and the specific claims at issue. That principle applies with equal force whether or not the plaintiff is a putative class representative.") (citations omitted).

These same courts have also found that a court does not have specific jurisdiction over individual claims asserted by nonresident named plaintiffs because there is no connection between their claims and the corporation's activities within the forum, even if those claims are similar or identical to claims brought in the same case by a resident named plaintiff against the same defendant. *See Sanchez v. Launch Tech. Workforce Sols., LLC*, No. 17-01904, 2018 WL 942963, at *1 (N.D. Ga. Feb. 14, 2018) (finding "individual members of a plaintiff class, *aside from named representatives*, need not satisfy the "minimum contacts" test in order for a [] forum court to exercise personal jurisdiction over them") (emphasis added) (citation omitted); *Greene*, 2017 WL 7410565, at *4 ("[D]ue process requires a connection between the forum and the specific claims at issue. That principle applies with equal force whether or not the plaintiff is a putative class representative.") (citations omitted); *Wenokur v. AXA Equitable Life Ins. Co.*, No. 17-00165, 2017 WL 4357916, at *4 (D. Ariz. Oct. 2, 2017) (finding it "lacks personal jurisdiction over the claims of putative class members with no connection to Arizona and therefore would not be able to certify a nationwide class"); *Covington v. Janssen Pharm., Inc.*, No. 17-1588, 2017 WL 3433611, at *5 (E.D. Mo. Aug. 10, 2017) (finding that because "53 of the 54 total plaintiffs failed to allege that they ingested the drug in the state of Missouri or suffered from resulting injuries in Missouri. Instead, those 53 plaintiffs allege only that the defendants transacted business and committed torts in the State of Missouri. But those plaintiffs were not injured form the defendants' contacts with the state of Missouri. Because the 53 plaintiffs' claims do not arise out of the defendants' contacts with the state of Missouri, this Court lacks specific personal jurisdiction over their claims").

In an effort to distinguish *Bristol-Myers*, Plaintiffs rely on *Swamy v. Title Source, Inc.*, No. 17-01175, 2017 WL 5196780 (N.D. Cal. Nov. 10, 2017). However, *Swamy* is not inconsistent with *Bristol-Myers* or the cases cited above. In *Swamy*, a California resident brought a putative class action under the Fair Labor Standards Act ("FLSA") on behalf of himself and others similarly situated, including nonresident employees of the defendant. *Id.* at *1-2. The defendant moved to dismiss the cases against the nonresident, putative opt-in plaintiffs for lack of personal jurisdiction. *Id.* at 1. The Court rejected the argument that *Bristol-Myers* precludes a court from exercising personal jurisdiction over the claims of *out-of-state opt-in plaintiffs in a collective action* proceeding under the FLSA. *Id.* at 2.

Here, in contrast to *Swamy*, Larson and Pollard are not nonresident, putative opt-in plaintiffs, instead they have affirmatively brought this putative class action as named plaintiffs. Therefore, there must be a connection between their claims and SERVICES and MOBILITY activities within New Jersey, even if Larson and Pollard's claims are similar or identical to claims brought by the resident named plaintiffs. *See Sanchez*, No. 17-01904, 2018 WL 942963, at *1 (finding "individual members of a plaintiff class, *aside from named representatives*, need not satisfy the "minimum contacts" test in order for a [] forum court to exercise personal jurisdiction over them") (emphasis added) (citation omitted); *Greene*, 2017 WL 7410565, at *4 (N.D. Ill. Dec. 11, 2017) (finding "that due process requires a connection between the forum and the specific claims at issue. That principle applies with equal force whether or not the plaintiff is a putative class representative") (citations omitted); *Wenokur*, 2017 WL 4357916, at *4 (finding it "lacks personal jurisdiction over the claims of putative class members with no connection to Arizona and therefore would not be able to certify a nationwide class").

While Plaintiffs allege SERVICES and MOBILITY have business locations and employees in New Jersey, they do not allege Larson or Pollard were one of those employees. In fact, Larson is a citizen of the state of Arizona and worked for "AT&T" from her home in Arizona (ECF No. 1 ¶¶ 3, 102-03) and Pollard is a citizen of the state of Florida and worked for "AT&T" from his home in Florida. (*Id.* ¶¶ 5, 181.) Both Plaintiffs received their W-2 from SERVICES, which is incorporated in Delaware and headquartered in Texas. (*Id.* ¶ 15.) Because Larson and Pollard's claims relate to their employment, the facts giving rise to their claims in this circumstance could not have arisen in New Jersey. For that reason, there is no specific jurisdiction as to their claims against SERVICES and MOBILITY. Accordingly, SERVICES and MOBILITY's Motion to Dismiss as to Larson and Pollard's claims is **GRANTED**.

**B.      CORP, SERVICES and MOBILITY's Motion to Dismiss Larson and Seaman's Claims**

### 1.      Whether Larson and Seaman Allege Facts Sufficient to Support a Collective Action

CORP, SERVICES and MOBILITY argue Larson and Seaman's class action claims should be dismissed for failure to "give rise to a plausible claim that any unlawful discriminatory practice has affected similarly situated individuals." (ECF No. 22-1 at 7.) Plaintiffs argue CORP, SERVICES, and MOBILITY's Motion to Dismiss is improper at this stage because Plaintiffs have not yet moved to certify the class and because they have sufficiently plead the necessary elements of an ADEA class claim. (ECF No. 41 at 5-6, 9-10.)

In most federal class actions, the issues of joinder among, and notice to, potential class members are governed by Federal Rules of Civil Procedure 23. However, class actions brought under the ADEA are governed by Section 7(b) of the ADEA, 29 U.S.C. § 626(b), which incorporates certain select provisions of the FLSA, 29 U.S.C. §§ 201 *et seq.*, to establish the

"powers, remedies, and procedures" by which the ADEA is to be enforced. One of these provisions, 29 U.S.C. § 216(b), provides for class actions as follows:

> An action to recover the liability prescribed . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Therefore, ADEA class actions may only proceed under 29 U.S.C. § 216(b), and not under Rule 23. *See, e.g.*, *Lusardi v. Xerox Corp.*, 99 F.R.D. 89, 92 (D.N.J. 1983), *app. dismissed*, 747 F.2d 174 (3d Cir. 1984); *LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir. 1975). Section 216(b) creates an "opt-in" mechanism for class formation and Rule 23 creates an "opt-out" mechanism, and, in the case of the ADEA, the incorporation of the former prohibits application of the latter. *Lusardi*, 99 F.R.D. at 92, *LaChapelle*, 513 F.2d at 289.

Pursuant to § 216(b) an ADEA plaintiff may "maintain" a suit on behalf of itself and other employees once two conditions are met: (1) the named plaintiffs and the other employees must be "similarly situated;" and (2) the other employees must have filed written consents to join the action. *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 399 (D.N.J.), *aff'd in part, appeal dismissed in part sub nom.*, 862 F.2d 439 (3d Cir. 1988), *aff'd and remanded sub nom.*, 493 U.S. 165 (1989); *Lusardi*, 99 F.R.D. at 91-92.

Due to the two-stage class certification process in ADEA class actions, there is disagreement among the district courts as to whether dismissal of ADEA collective action allegations under Rule 12(b)(6) is proper before a plaintiff has made a motion for conditional class certification under *Lusardi*. A minority of district courts have held that a motion to dismiss is inappropriate to challenge the sufficiency of class allegations when the plaintiffs have not yet

moved for conditional certification. *Barrett v. Forest Labs., Inc.*, No. 12–5224, 2014 WL 4058683, at *9 (S.D.N.Y. Aug. 14, 2014); *Lang v. DirecTV, Inc.*, 735 F. Supp. 2d 421, 434–36 (E.D. La. 2010). These courts reason that the "challenge on the pleadings [is an] end-run [around] the certification process," since the plaintiffs have not had the opportunity to develop the record. *Lang*, 765 F. Supp. 2d at 435–36.

The majority of courts have found that a Rule 12(b)(6) dismissal of class allegations is appropriate, even when the plaintiff has not yet filed a motion for conditional class certification. *See Zanders v. Wells Fargo Bank, N.A.*, No. 14–00288, 2014 WL 5439298, at *12 (S.D. Iowa Oct. 28, 2014); *Dyer v. Lara's Trucks, Inc.*, No. 12–1785, 2013 WL 609307, at *3 (N.D. Ga. Feb. 19, 2013); *Creech v. Holiday CVS, LLC*, No. 11–46, 2012 WL 4483384, at *2–3 (M.D. La. Sept. 28, 2012). These courts reason that Rule 12(b)(6) requires a plaintiff to give the defendant fair notice of the putative class, which is a much different inquiry than the inquiry at the conditional class certification stage. *Dyer*, 2013 WL 609307, at *3.

Decisions from this District "have made clear that dismissal of class allegations at this sta[g]e should be done rarely and that the better course is to deny such motion because the shape and form of a class action evolves only through the process of discovery." *Oravsky v. Encompass Ins. Co.*, 804 F. Supp. 2d 228, 241 (D.N.J. 2011) (quoting *Myers v. MedQuist, Inc.*, No. 05-4608, 2006 WL 3751210, at *4 (D.N.J. Dec. 20, 2006) (citing *Gutierrez v. Johnson & Johnson, Inc.*, 2002 WL 34717245, *5 (D.N.J. 2002); *Abdallah v. Coca–Cola Co.*, No. 98-3679, 1999 WL 527835, *1-2 (N.D. Ga. July 16, 1999))); *Landsman & Funk PC v. Skinder–Strauss Assocs.*, 640 F.3d 72, 93 (3d Cir. 2011) ("[Only in a] rare [case does] the complaint itself demonstrate [ ] that the requirements for maintaining a class action have not been met.") (other citations omitted).

While in some "rare" cases it may be appropriate pursuant to Rule 12(b)(6) to dismiss class pleadings that are entirely inadequate, this is not such a case. Although the Court is skeptical the facts will show that class resolution is appropriate in this case because Larson and Seaman do not allege that they and all putative collective members were employed by the same AT&T entity, worked in the same department, performed similar work, or had similar circumstances of employment, the Court does find the motion is premature at this stage. *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012) (stating that factors relevant to whether plaintiffs are similar situated include, but are not limited to "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment"). Indeed, Larson and Seaman have at least alleged they and the potential opt-ins have been injured by a single policy, the 2020 Scheme, which targeted workers over the age of 40. (ECF No. 1 ¶¶ 39-40, 54-88.) Accordingly, CORP, SERVICES and MOBILITY's Motion to Dismiss Larson and Seaman's class action claims is **DENIED**.

### 2. Whether Seaman Waived her Right to Participate in a Collective Action

CORP, SERVICES, and MOBILITY argue Seaman waived her right to participate in a collective action because "she signed an agreement for good and sufficient consideration that contains a waiver of her right to participate in a collective action." (ECF No. 22-1 at 12.) Plaintiffs argue Seaman did not waive her right to participate in a collective action because the General Release and Waiver is invalid and unenforceable because it did not comply with the OWBPA and is part of a larger scheme to violate the ADEA. (ECF No. 41 at 17-18.)

Congress amended the ADEA by passing the OWBPA in 1990. *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426 (1998). The OWBPA provides: "An individual may not waive *any right or claim* under [the ADEA] unless the waiver is knowing and voluntary. . . . [A] waiver may not be considered knowing and voluntary unless at a minimum" it satisfies certain enumerated requirements, including the three listed above. 29 U.S.C. § 626(f)(1) (emphasis added). An employee is considered not to have waived an ADEA claim unless the employer complies with the OWBPA statute. *Oubre*, 522 U.S. at 427. The statutory command of the OWBPA is clear, "[a]n employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." *Id.* at 426-27.

> The policy of the OWBPA is likewise clear from its title: It is designed to protect the rights and benefits of older workers. The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word. Congress imposed specific duties on employers who seek releases of certain claims created by statute. Congress delineated these duties with precision and without qualification: An employee "may not waive" an ADEA claim unless the employer complies with the statute. Courts cannot with ease presume ratification of that which Congress forbids.

*Id.* at 427. Moreover, "[t]he text of the OWBPA forecloses the employer's defense, notwithstanding how general contract principles would apply to non-ADEA claims." *Id.*

Courts have interpreted the phrase "waive any right or claim" under § 626(f)(1) as referring narrowly to waiver of *substantive* ADEA rights or claims—not procedural rights such as a right to a jury trial or right to proceed as a class action. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009); *McLeod v. Gen. Mills, Inc.*, 856 F.3d 1160 (8th Cir. 2017). In *14 Penn Plaza LLC*, the Supreme Court addressed the meaning of "rights or claims" under § 626(f)(1)(C), which prohibits waiver of "rights or claims that may arise after the date the waiver is executed." The Court held

that an agreement to bring future claims in arbitration was not a waiver of "rights or claims," "[t]he decision to resolve ADEA claims by way of arbitration instead of litigation does not waive the statutory right to be free from workplace age discrimination; it waives only the right to seek relief from a court in the first instance." *14 Penn Plaza*, 556 U.S. at 265-66, 259 (clarifying that an "agreement to arbitrate ADEA claims" is not a waiver of "the 'right' referred to in § 626(f)(1)"). Therefore, *14 Penn Plaza* interprets § 626(f)(1)'s references to "right[s] or claim[s]" to mean substantive rights to be free from age discrimination, not procedural "rights" to pursue age discrimination claims in court. *McLeod*, 856 F.3d at 1165.

In *McLeod*, the Eighth Circuit held that § 626(f)'s "'waiver' refers narrowly to waiver of substantive ADEA rights or claims—*not*, as the former employees argue, the 'right' to a jury trial or the 'right' *to proceed in a class action*." *McLeod*, 856 F.3d at 1164. The court reasoned that § 216(b), incorporated by § 626(b), which states, "An action to recover . . . liability . . . may be maintained . . . in any . . . court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated," only "authorizes employees to bring collective age discrimination actions [o]n behalf of . . . themselves and other employees similarly situated." *Id.* at 1165. "Standing alone, § 216(b) does not create a non-waivable substantive right; rather, its class-action authorization can be waived by a valid arbitration agreement." *Id.* Authorizations of a class action does not create a "right." *Id.* at 1166.

Here, the General Release and Waiver contains four subsections: (1) Release and Waiver; (2) Non-Interference and Acknowledgement of Payments Received; (3) Class, Collective and Representative Action Waiver; and (4) Older Workers Benefit Protection Act Disclosures. (ECF No. 16-6 at 23-25.) The General Release and Waiver covers ADEA claims:

I understand that there are various local, state and federal laws that govern any employment relationship with the Participating Company and/or prohibit discrimination on the basis of age, color, race, gender, sexual orientation, marital status, national origin, mental or physical disability, religious affiliation or veteran status. Such laws include, but are not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Americans with Disabilities Act. By signing this General Release and Waiver, I intend to release any claims I may have under these or any other laws with respect to my employment and to the termination of my employment with the Participating Company.

. . . .

I expressly understand and agree that this is a General Release that, to the fullest extent permitted by law, waives surrenders, and extinguishes all claims that I have or may have against the Released Parties, including but not limited to claims under Title VII of the Civil rights Act of 1964 (title Vii), the Civil Rights Act of 1991, the Age Discrimination Act (ADEA) . . . . PROVIDED, HOWEVER, I am not waiving, releasing or giving up any rights I may have to challenge the knowing and voluntary nature of this General Release and Waiver under the Older Workers benefit Protection Act (OWBPA).

(*Id.* at 23-24.) The Class, Collective and Representative Action Waiver states:

Without limiting the generality of the forgoing, I agree that I will not bring, maintain or participate in any class action, collective action or representative action against any of the Companies which asserts, in whole or in part, any claim(s) which arose prior to the date I sign this Agreement, whether or not such claims are covered by this General Release and Waiver. I further agree that if I am included within a class, collective, or representative action, I will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.

(*Id.* at 24.) Therefore, the General Release and Waiver clearly attempts to waive Plaintiffs' ADEA claims, and must comply with the OWBPA.

Even assuming, as the Court must for purposes of this Motion to Dismiss, that the General Release and Waiver did not satisfy the specific requirements of the OWBPA, Seaman only retains

the right to bring an individual ADEA action against Defendants. The remaining portions of the General Release and Waiver remain enforceable, such as the Class, Collective and Representative Action Waiver. *See Oubre*, 522 U.S. at 427–28 ("Since Oubre's release did not comply with the OWBPA's stringent safeguards, it is unenforceable against her insofar as it purports to waive or release her ADEA claim."); *Branker v. Pfizer, Inc.*, 981 F. Supp. 862, 867 (S.D.N.Y. 1997) (stating that noncompliance with the minimum requirements of the OWBPA would only "invalidate a release of those claims . . . failure to comply with the OWBPA cannot invalidate release of . . . claims under the NYCHRL and NYSHRL claims, as well as the claim of intentional infliction of emotional distress"). Because § 626(f)'s "waiver" refers only to waiver of substantive ADEA rights or claims—not the "right" to proceed in a class action, Seaman's collective action allegations are dismissed because she waived her rights to pursue them.

Plaintiffs reliance on *Oubre* and *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989) for the proposition that the class action provision in unenforceable is misplaced. In fact, in *Oubre*, the Supreme Court held that a waiver of substantive rights to bring an ADEA claim was invalid because it did not comply with the OWBPA's waiver requirements. *Oubre*, 522 U.S. at 428. In *Hoffmann-La Roche*, the Supreme Court held that district courts have the discretion in ADEA actions to facilitate notice to potential plaintiffs' and that plaintiffs can discover the names and addresses of discharged employees. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. at 174. Neither decision found that the OWBPA's waiver requirements applied to procedural rights.

Plaintiffs further argue the Court should not dismiss Seaman's class action claims because the waiver was fraudulent and part of an illegal scheme. (ECF No. 41 at 25-26.) However, other than those bare bone allegations, Plaintiffs fail to articulate any facts demonstrating the remainder of the General Release and Waiver was entered into involuntarily or unknowingly or was

unconscionable. Accordingly, CORP, SERVICES, and MOBILITY's Motion to Dismiss Seaman's class action claims is **GRANTED**. As such, Larson may proceed with her class action claims, but Seaman may only proceed individually.

### 3. Declaratory Judgment that Defendants Violated the OWBPA (Count III)

CORP, SERVICES and MOBILITY argue Count III of the Complaint, declaratory judgment stating that Defendants violated the OWBPA by failing to procure a valid release of Plaintiffs' ADEA claims should be dismissed because the OWBPA does not authorize an independent cause of action. (ECF No. 22-1 at 13.) In the alternative, they argue the Court should dismiss Count III for lack of standing because no Article III case or controversy arises when a plaintiff seeks a declaratory judgment as to the validity of a defendant that a defendant may or may not use. (ECF No. 45 at 10.) Plaintiffs claim "aggrieved individuals have the right to seek equitable relief in the form of a declaratory judgment and related injunction regarding violations of the OWBPA." (ECF No. 41 at 12.)

At least one Court in this District has determined that "[u]nder the OWBPA, Plaintiffs are entitled to no 'affirmative relief, other than *declaratory or injunctive* relief to negate the validity of the waiver, as it applies to an ADEA claim.'" *Al-Farook v. Marina Dist. Dev. Co., LLC*, No. 13-138, 2013 WL 6177933, at *3 (D.N.J. Nov. 25, 2013) (emphasis added) (quoting *Whitehead v. Oklahoma Gas & Elec. Co.*, 187 F.3d 1184, 1191 (10th Cir. 1999); *accord Krane v. Capital One Servs.*, 314 F. Supp. 2d 589, 609–10 (E.D. Va. 2004)). Here, Plaintiffs seek declaratory relief stating the OWBPA was violated. The Court agrees with this District's precedent and will not delve into the statutory construction arguments articulated by CORP, SERVICES, and MOBILITY in their brief and at oral argument. (*See* ECF No. 22-1 at 14.) To the extent Plaintiffs

seek anything other than a declaratory judgment and seek secondary relief, including attorney's fees and various other legal and equitable remedies, they are not entitled to such. *Al-Farook*, 2013 WL 6177933, at *3. They are only entitled to "declaratory or injunctive relief to negate the validity of the waiver, as it applies to an ADEA claim." *Id.* Nevertheless, this argument is irrelevant because the Court lacks jurisdiction over Count III.

The Court finds it lacks jurisdiction over Count III because there is no Article III case or controversy. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

Article III "standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

As in *Spokeo*, "[t]his case primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements." *Id.* (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be

'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (citations omitted). "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Id.* "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (explaining that "[w]hen we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term – 'real,' and not 'abstract'"). "Concreteness, therefore, is quite different from particularization." *Id.*

In *McLeod*, thirty-three plaintiffs who signed releases requested declaratory judgment that the releases were not knowing and voluntary, even though the employer had not threatened or attempted to enforce the ADEA waiver. *McLeod*, 856 F.3d at 1163, 1166-67. The court held:

> An Article III case or controversy may exist where a private party threatens an enforcement action that would cause an imminent injury. Here, though, the former employees do not plead that General Mills threatens any enforcement of the ADEA claim waiver, let alone enforcement that would cause them imminent injury. Instead, they request a declaration of their rights under a hypothetical set of facts. They want to know their legal rights if, in the future, General mills asserts that the waivers of their substantive ADEA rights were "knowing and voluntary" under § 626(f)(3).

It further concluded "[n]o Article III case or controversy arises when plaintiffs seek 'a declaratory judgment as to the validity of a defense' that a defendants 'may, or may not, raise' in a future proceeding." *Id.* at 1167 (quoting *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998)).

Here, much like the case in *McLeod*, Plaintiffs do not plead that CORP, SERVICES, and MOBILITY threaten enforcement of the ADEA claim waiver. They too request a declaration of their rights under a hypothetical set of facts, as if CORP, SERVICES, and MOBILITY invoked the defense. As such, the Court does not have jurisdiction over Plaintiffs' declaratory judgment claims. Accordingly, CORP, SERVICES, and MOBILITY's Motion to Dismiss Count III of the Complaint is **GRANTED**.

#### 4. Collective Disparate Impact Claim (Count II)

CORP, SERVICES, and MOBILITY argue Plaintiffs' collective disparate impact claim should be dismissed because they do not identify a specific, facially neutral practice or policy. (ECF No. 22-1 at 17-21.) Plaintiffs argue they can proceed under a disparate impact or disparate treatment theory because the Complaint alleges a specific facially neutral policy. (ECF No. 41 at 27.)

A plaintiff's initial burden is heavier under a disparate impact theory than it is under a disparate treatment theory. *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 120 (3d Cir.), *cert. denied*, 464 U.S. 937 (1983); *Bratek—v. TD Bank, N.A.*, No. 11–3049, 2012 WL 603299, at *6 (D.N.J. Feb. 22, 2012) (citing *Cherchi v. Mobil Oil Corp.*, 693 F. Supp. 156, 166 (D.N.J. 1988) *aff'd*, 865 F.2d 249 (3d Cir. 1988)). "To state a prima facie case for disparate impact under the ADEA, a plaintiff must (1) identify a specific, facially neutral policy, and (2) proffer statistical evidence that the policy caused a significant age-based disparity." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017) (citing *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476–77 (3d Cir. 2011)). If a plaintiff establish a prima facie case, "an employer can defend by arguing that the challenged practice was based on 'reasonable factors other than age'— commonly referred to as the 'RFOA' defense." *Id.* (citing 29 U.S.C. § 623(f)(1); 29 C.F.R. § 1625.7).

Although a plaintiff need not establish discriminatory motive or intent under a disparate impact theory, proof of actual discrimination is a necessary element. Plaintiffs must show that a facially neutral standard resulted in a significantly discriminatory pattern or impact. *Bryant v. Int'l Sch. Sers., Inc.*, 675 F.2d 562, 572 (3d Cir. 1982) (citations omitted). To plead a disparate impact claim under the ADEA, "it is not enough to simply allege that there is a disparate impact on

workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Smith v. City of Jackson Miss.*, 544 U.S. 228, 241 (2005) (internal citations omitted). Moreover, the plaintiff must show that the "facially neutral employment practice had a significantly discriminatory impact." *Connecticut v. Teal*, 457 U.S. 440, 446 (1982). Statistical evidence of this impact "must be limited in scope in accordance with [Federal Rule of Civil Procedure] 26(b)(1) and tied to the allegations of plaintiff's complaint." *Kresefky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 66 (D.N.J. 1996). Although

> there is no 'rigid mathematical formula' courts can mandate or apply to determine whether plaintiffs have established a prima facie case . . . a plaintiff will typically have to demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random, and to do so by using one of several tests of statistical significance.

*Petruska v. Reckitt Benckiser, LLC*, No. 14-03663, 2015 WL 9582142, at *3 (D.N.J. Dec. 29, 2015) (quoting *Stagi v. Nat'l R.R. Passenger Corp.*, 391 F. App'x 133, 137 (3d Cir. 2010) (internal citations omitted)).

Here, Plaintiffs fail to identify a specific, *facially neutral policy*. Instead, they plead Defendants implemented an intentionally bias 2020 Scheme. (*See* ECF No. 1 ¶ 42 ("AT&T maintains a corporate culture of age discrimination that emanates from the highest levels of the company."); ¶ 51 ("As part of its company-wide '2020' plan to transform its aging workforce, AT&T has for several years conducted vast involuntary group terminations with the intent and effect of eliminating older workers from its workforce."); ¶ 56 ("AT&T's three-step 'surplus,' then termination and fraudulent release scheme is infected with age bias.").) Courts have held that such allegations amount to a claim for disparate treatment—not disparate impact. *See Maresco v. Evans*

*Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992) (stating that "allowing the disparate impact doctrine to be invoked as [the plaintiff] proposes would simply provide a means to circumvent the subject intent requirement in any disparate treatment case."); *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 281 (D. Conn. 2009) ("Plaintiff alleges that the Defendant's procedure in conducting the RIFs were nothing more than a cover for behind-the-scenes, intentional dissemination against its older employees. There is no allegation of a facially neutral practice or policy that fell more harshly on the protected group."). As such, "where the employment practices support the Plaintiff's disparate impact claims are the employment practices supporting the disparate treatment claims," they should be dismissed because "it provides a means for the Plaintiff to avoid establish the subjective intent requirement for her disparate treatment claims." *Zawacki*, 628 F. Supp. 2d at 281 n.4. Accordingly, CORP, SERVICES, and MOBILITY's Motion to Dismiss Count II of the Complaint as it applies to collective disparate impact is **GRANTED**.

**IV. CONCLUSION**

For the reasons set forth above: (1) INC's Motion to Dismiss for lack of jurisdiction is **DENIED**; (2) SERVICES and MOBILITY's Motion to Dismiss Larson and Pollard's claims for lack of jurisdiction is **GRANTED**; (3) and CORP, SERVICES, and MOBILITY's Motion to Dismiss for failure to state a claim is **DENIED** as to the class action claims and **GRANTED** as to all other requests.

Date: April 25, 2018                    */s/ Brian R. Martinotti*
                                        **HON. BRIAN R. MARTINOTTI**
                                        **UNITED STATES DISTRICT JUDGE**